Filed 1/27/15  Certified for Publication 2/9/15 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LINDA VISTA VILLAGE SAN DIEGO HOMEOWNERS ASSOCIATION, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> TECOLOTE INVESTORS, LLC, et al., <br><br> Defendants and Respondents. | D064741 <br><br><br> (Super. Ct. No. 37-2012-00085269- CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Affirmed; motion for judicial notice granted in part and denied in part.

Tatro & Zamoyski, Peter A. Zamoyski; Boudreau Williams and Jon R. Williams for Plaintiff and Appellant.

Duckor Spradling Metzger & Wynne, Anna F. Roppo, Douglas W. Lytle and Robert M. Shaughnessy for Defendants and Respondents Tecolote Investors, LLC, C.H. Harp and Joan E. Harp (deceased), trustees of the C.H. Harp Family Trust; River Paradise Partnership; Stephen Leonard Fox and Lynda K. Fox, trustees of Fox Revocable Trust and Matthew Follett.

Jan I. Goldsmith, City Attorney, Daniel F. Bamberg, Assistant City Attorney and Carmen A. Brock, Deputy City Attorney, for Defendant and Respondent City of San Diego.

This matter comes to us on a judgment of dismissal of a complaint for declaratory and other relief, brought by plaintiff and appellant Linda Vista Village San Diego Homeowners Association, Inc. (Appellant). Its members are sublessees of mobilehome park lots on a real property site (the park site) that is subject to a 1979 master lease between the landowner defendant and respondent, the City of San Diego (the City), and the predecessors of defendants and Respondents Tecolote Investors, LLC, et al. (Landlord Defendants).[1] The master lease for the park site was entered into after the City negotiated with developers to provide low income housing opportunities there.

Appellant's complaint was filed in 2012 against the Landlord Defendants and the City (together Respondents), and alleges that the park site is located on and should be properly characterized as "Pueblo lands," within the meaning of San Diego City Charter section 219 (section 219). This section and its predecessors since 1909 have been applied to certain Pueblo lands north of the San Diego River to require approval by City Council ordinance and City voters for any sale or lease of them for more than 15 years.[2] (See

_____

[1] Additional Landlord Defendants and respondents are C.H. Harp and Joan E. Harp (deceased), trustees of the C.H. Harp Family Trust; River Paradise Partnership; Stephen Leonard Fox and Lynda K. Fox, trustees of Fox Revocable Trust and Matthew Follett.

[2] Section 219 reads in relevant part: "No sale of Pueblo Lands owned by The City of San Diego which are situated North of the North line of the San Diego River shall ever be valid and binding upon said City unless such sale shall have been first

2

*DeYoung v. City of San Diego* (1983) 147 Cal.App.3d 11, 15, 21 (*DeYoung*) [terms "sell or convey" impliedly include the power to lease].)

Since no voter approval was sought or obtained for this transaction, Appellant alleges the City was without power to enter into the existing 55-year master lease of the park site with the Landlord Defendants (or their predecessors). As a consequence, Appellant seeks decrees to invalidate the master lease and consequently its subleases, specifically attacking the 1983 City-approved provisions allowing periodic rent increases. Appellant also claims entitlement to various other types of relief, such as damages.

Following demurrer proceedings and a hearing on Appellant's motion for preliminary injunction, the trial court sustained the Landlord Defendants' demurrer without leave to amend, and denied the requested injunctive relief. At the joint hearing on the motions, Respondents presented to the trial court extensive historical documentation of the chain of title of the park site and its vicinity, through judicial notice requests and also by lodgment of exhibits in connection with authenticating declarations. According to the recorded ownership history of the park site and surrounding areas, at the close of the California Spanish-Mexican period and under the treaty of Guadalupe Hidalgo, the United States came into ownership in 1847 of many parcels of "Pueblo lands," including numbers 1190 and 1196, where this 74-acre park site is contained (designated here "the parcels"). (See *Richert v. City of San Diego* (1930) 109 Cal.App.

authorized by an ordinance duly passed by the Council and thereafter ratified by the electors of The City of San Diego at any special or general municipal election. The City Manager shall have authority to lease Pueblo Lands, provided that any lease for a term exceeding one year shall not be valid unless first authorized by ordinance of the Council. No lease shall be valid for a period of time exceeding fifteen years."

548, 555-556 (*Richert*).)  By the 1850's and as confirmed by an 1874 patent deed, the United States recognized the claim of the City to all property rights in those historic Pueblo lands.

Beginning in the 1850's, the City transferred its ownership of many of the Pueblo lands properties to various private landowners, starting with railroad companies, which in turn made additional conveyances.   In the 1940's, all existing private landowners of approximately 297 acres around and including the parcels became subject to judgments of eminent domain takings by the federal government.  In 1959, the federal government recorded a quitclaim deed back to the City of all those holdings.  In the 1970's, after the Landlord defendants' predecessor agreed to provide low income housing opportunities on the parcels, the 1979 master lease was signed.[3]

Against this historic backdrop, Appellant argues on appeal that the trial court utilized the wrong legal standards in sustaining the demurrer, and abused its discretion in denying leave to amend the pleading.  Appellant contends the master lease entered into between the Respondents, as amended and assigned, was invalid, void, or voidable, for lack of compliance with the voter approval term of section 219.  Based on Appellant's

[3]     The parcels have had several historic designations, beginning for our purposes with Pueblo Lands Nos. 1190 and 1196 in the U.S.-City patent deed (from an 1800's map, the Pascoe Map).  A 1957 County survey map changed the designations of Pueblo Lands Nos. 1190 and 1196 (and other adjoining Pueblo Lands parcels) to Parcels Nos. 11, 12, 13, 14, and 15, all amounting to 297.3437 acres then owned by the federal government. In 1959, the federal government quitclaimed to the City all the parcels it had taken.  In the 1997 assignment of the lease to the Landlord defendants, the description of the park site within the parcels, as found in a 1980 recorded map, is Lots 1 through 4 of Linda Vista Village.  For purposes of charter interpretation, we refer to the parcels as a whole, even though the park site occupies only a portion of them.

4

broad interpretation of this charter provision for voter approval of transfer of Pueblo lands, it argues that regardless of the history of title of the parcels, it can successfully amend to allege that the "reacquired" parcels retained "the nature of Pueblo lands" and should still be "classified" or characterized as Pueblo lands that are subject to these charter restrictions on transfers.

Appellant thus contends these parcels remain within the protections and prohibitions of section 219, even though they were released from City ownership for years but were then returned to it. Appellant seems to argue that the charter requirement of voter approval survived all transfers of the parcels, including the eminent domain proceedings, even if the Pueblo lands regulation became dormant or " 'quiescent' " at times. (See *U.S. v. 32.42 Acres of Land, More or Less, Located in San Diego County, Cal.* (9th Cir. 2012) 683 F.3d 1030, 1034 (*U.S. v. 32.42 Acres of Land*).)

On review, we apply the rule that a complaint may be subject to demurrer where facts that can be judicially noticed render it defective. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 (*Evans*).) Before oral argument, we gave notice to the parties that we proposed to take judicial notice on appeal of certain recorded title documents in the record, showing the mid-19th century transfers of the parcels out of City ownership to private landowners, followed by a federal exercise of eminent domain that took the parcels by judgments recorded in the 1940's. In 1959, a quitclaim deed returned the parcels to the City. (Evid. Code, §§ 452, subd. (d); 455, subd. (a); 459, subd. (c).)

In response to the notice we gave, the Landlord Defendants submitted a motion for judicial notice of their previously lodged documents containing that same chain of title

5

information, as well as other documents submitted with their opposition to the preliminary injunction request. Opposition has been received and considered and the matter discussed at oral argument. As explained in part III.D, *post*, the judicial notice motion is granted in part and denied in part.

In light of the applicable authorities, the recorded title documents for the parcels demonstrate as a matter of law that on this record, the restrictions of section 219 do not apply, the face of the pleading fails to state its causes of action, and the Landlord Defendants' demurrer was correctly sustained without leave to amend. Based on de novo analysis that is akin to judgment on the pleadings, the record fully supports the dismissal of all causes of action as to the City as well. (See *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 701-703 (*Coshow*); pt. III.B, *post*.) We affirm.

I

*BACKGROUND*

A. Complaint

In analyzing the challenged demurrer ruling, we take the facts properly pleaded to assess, as a matter of law, whether they state their causes of action. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) In ruling on demurrers, courts appropriately " 'consider matters which may be judicially noticed,' " as if they had been pled. (*Evans, supra,* 38 Cal.4th 1, 6; *Helix Land Co. v. City of San Diego* (1978) 82 Cal.App.3d 932, 937 (*Helix Land Co.*) [where demurrers were sustained without leave to amend, the reviewing court may consider other relevant matters of which the trial court could have taken notice, if relevant, as having been pleaded]; *Weil v. Barthel* (1955) 45 Cal.2d 835, 837.) The

6

courts accept the plaintiff's properly pleaded facts as true, but a demurrer is not deemed to admit any conclusions of law or fact, nor any mere contentions. (*People ex rel Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300-301.)

The complaint sets forth five causes of action, initially seeking declaratory relief against all Respondents, on the basis that the park site is "located . . . on Pueblo Lands . . . ." As against the Landlord Defendants, the Association brings related claims for setting aside the master lease or subleases through rescission, or for recovering damages for statutory violations or negligent misrepresentation. All claims are based on the premise that this portion of the City's parcels could not be leased to the Landlord Defendants without voter approval. (Unfair Business Practices, Bus. & Prof. Code, § 17200 et seq.; Mobilehome Residency Law, Civ. Code, § 798, et seq.) All causes of action were pled in terms of a class or representative action, on the basis that there were numerous residents who had typical claims, based on common issues of law and fact regarding the validity of the lease and subleases under section 219.

In paragraph 38 of the complaint, Appellant originally pled that the site of the park within the parcels had been maintained in the City's ownership since January 19, 1909 (the date of an important charter amendment to the predecessor of section 219), through the date of the master lease in 1979. (See pt. III.C, *post*.) However, Appellant now concedes that in other transactions beginning in the 1850's, the City transferred the

7

parcels into private ownership, beginning with various railroad enterprises.[4]  The parcels

remained in private hands until 1941, when the federal government took them for World

War II defense housing.  In 1959, the federal government returned the entire 297.3437

acres in the two parcels to City ownership by a quitclaim deed.

The complaint sets forth the history of the 1979 master lease arrangements,

including a 1977 City resolution to enable a portion of the parcels to be developed as

mobilehome properties and leased to low or moderate income tenants for the term of the

lease.  Other City resolutions continued to require low or moderate income housing to be

provided there.  The mobilehome park began operating in late 1980, and the Master

Lease was amended several times.

In 1983, negotiations were held on disputes among the parties about preserving the

low income status of the property.  Only the Landlord Defendants and the City remained

parties to the lease, but they consulted a committee of Appellant homeowners'

association.  The 1983 amendments changed the base rent provisions in the master lease

to allow a yearly minimum increase in space rent and to provide for reduction of rent for

subsidized tenants, among other things.  In 1997, the Landlord Defendants took the

master lease by assignment.

---

[4]     The 1889 charter did not allow transfer of Pueblo lands that had been dedicated or
reserved for public use (e.g., parks), although the Supreme Court held in *Ames v. City of
San Diego* (1894) 101 Cal. 390, 395 that adverse possession could occur against other
types of City holdings.  (*Richert*, *supra*, 109 Cal.App. at p. 556.)  These parcels have
never been dedicated to public use and this is not an adverse possession claim about
them. (Cf. *Hoadley v. San Francisco* (1875) 50 Cal. 265, 275-276 (*Hoadley*).)

In all its causes of action, Appellant claims that due to the alleged voidness or invalidity of the master lease for noncompliance with section 219, the Landlord Defendants and their predecessors had no power to impose rent increases, and that Appellant's members were being constructively evicted through such conduct. Appellant sought a preliminary injunction to restrict the Landlord Defendants from raising rents or dissipating services, pending the outcome of these claims.

### B. Responses and Motions

The City filed an answer to the complaint, asserting as affirmative defenses that the City's conduct was legal and that Appellant had failed to state any of its causes of action, as well as numerous other defenses.

The Landlord Defendants demurred, asserting failure to adequately state any of the causes of action, and a lack of standing in Appellant to pursue any such claims.

After a temporary restraining order was granted, Respondents each opposed Appellant's motion for a preliminary injunction, and joined in each other's opposition. In the moving and opposing papers for both the demurrer and the injunction, the parties discussed the effect of the ownership history of these parcels. The lodged defense exhibits included copies of judgments from the eminent domain takings of the parcels by the federal government in the 1940's and the quitclaim deed returning the parcels to City ownership in 1959.

With respect to the Landlord Defendants' demurrer proceedings, held concurrently with Appellant's preliminary injunction request, the record does not indicate that the trial court was requested to take judicial notice of those historic private transfer deeds, or the

9

recorded eminent domain judgments, or the quitclaim deed to the City. In opposition to the preliminary injunction motion, the Landlord Defendants requested judicial notice of maps associated with the quitclaim deed from the federal government to the City, but did not do so for the deed itself, or the 1940's condemnation judgments.[5]

## C. Hearing and Rulings

Before the hearing, the trial court tentatively indicated in writing that any fact-based standing issues that were being raised, in terms of Appellant's entitlement to class certification, could not be appropriately resolved through demurrer proceedings. The trial court requested that the parties address, at the upcoming hearing, certain additional significant issues relating to standing that might affect the outcome of the motions.

At the hearing before the trial court, Appellant contended the City could not claim that the previous conveyances cleared restrictions on these Pueblo lands. Instead, the parcels should remain subject to the terms of section 219. Appellant offered to set forth evidence that the City had reacquired several other parcels of former Pueblo lands and had sought voter approval for future transfers of them. Without granting any offer of proof, the court took the matter under submission.

---

[5] As noted, these materials were the subject of our order of October 21, 2014 notifying the parties we proposed to take judicial notice on appeal of title documents. (Evid. Code, §§ 455, 459.) We subsequently received the Landlord Defendants' motion requesting such judicial notice, as well as opposition, and addressed those issues at oral argument. Although Appellant requested an opportunity to file supplemental briefing on the propriety of the requested judicial notice, or to further address estoppel issues against the City, we declined its request on the basis that the pertinent ownership issues are subject to resolution as issues of law on the current and now supplemented record. (See pt. III.D, *post*.)

10

In the written ruling, the trial court sustained the demurrer without leave to amend on numerous alternative grounds, including determinations that Appellant lacked standing to sue on the related causes of action, and the action was barred by the applicable limitations periods. The court also ruled that the parcels had lost any characterization of "Pueblo Lands," within the meaning of section 219, through numerous title transfers. The request for injunctive relief was denied. Both as to the Landlord Defendants and the City, the court dismissed the entire action.

Subsequently, Appellant filed a motion for reconsideration of that ruling or for a new trial, setting forth documentation of the same three examples, as previously offered, about other former Pueblo lands parcels that had been reacquired by the City, then subjected to voter approval for future transactions about them. Appellant argued, without authority, that the City should be estopped from denying that election proceedings were required by section 219 regarding a lease transfer of these parcels, such as it had conducted elsewhere. Appellant defended the adequacy of its standing to sue and the timeliness of its filing of the complaint. Reconsideration was denied, Appellant brought this appeal, and we heard oral argument.

## II

### *ISSUES PRESENTED AND SCOPE OF APPELLATE ANALYSIS*

We review the dismissal judgment that followed the ruling sustaining, without leave to amend, the Landlord Defendants' demurrer, which was heard concurrently with Appellant's motion for a preliminary injunction. Appellant makes no arguments on appeal about the denial of the injunctive relief. Although that ruling is not directly before

11

us in this appeal, the trial court correctly observed that there was a fair amount of "cross-over" analysis and documentation between the two sets of motions, and that is true of the reconsideration phase of the proceedings, as well.

In that light and on this record, we next address various procedural problems argued by the parties. In parts III and IV, *post*, we shall analyze the adequacy of the complaint's statement of its declaratory relief and related causes of action, and address the judicial notice motion on appeal.

### A. Preliminary Standing Discussion; Limitations Issue

Appellant complains that the trial court employed irregular procedures here in connection with the demurrer, by sua sponte raising issues about problems with Appellant's standing to sue and the applicable limitations periods, or by incorrectly utilizing preliminary injunction legal standards. Appellant further claims the court abused its discretion by failing to allow amendment of the pleadings, particularly in connection with the denial of its reconsideration motion.

Based upon the nature of the legal issues inherent in dismissal of this complaint on demurrer, the better approach on appeal is to assume arguendo that Appellant can sufficiently assert standing to sue on each of the related causes of action. We will posit here that Appellant can adequately show its fitness to raise issues about whether the master lease is in compliance with City charter standards. (See *Harman v. City and County of San Francisco* (1972) 7 Cal.3d 150, 159 [municipal taxpayer had standing to challenge alleged waste of municipal assets]; Code Civ. Proc., § 526a.)

12

We likewise accept for purposes of argument that Appellant can assert standing to challenge the validity of the City/Landlord Defendants' master lease, based upon alleged third-party beneficiary status, as "intended beneficiaries" of the lease contract. (*Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 127-128 (*Marina Tenants Assn.*).) [issues of law resolved on demurrer where trial court took judicial notice of a public entity's master lease, which placed the master lease within the scope of the pleadings]; *Helix Land Co.*, *supra*, 82 Cal.App.3d at p. 937.)

To the extent that statutory limitations theories formed a basis of the challenged ruling, we need not resolve those issues. (Gov. Code, § 66499.37 [Subdivision Map Act provisions]; Gov. Code, § 65009 [Planning and Zoning Law provisions].) We view this complaint as essentially alleging that public property was illegally transferred, in violation of "binding" charter provisions. Such claims about ongoing public entitlement to use of contested property can be exempted from the application of statutes of limitations. For claims of adverse or illegal use of public property, " 'It is immaterial where the title—that is, the record title—is held, whether by the state at large, or by a county, or by some municipal department or other official body. There can be no adverse holding of such land which will deprive the public of the right thereto, or give title to the adverse claimant, or create a title by virtue of the statute of limitations. The rule is universal in its application to all property set apart or reserved to the public use, and the public use for which it is appropriated is immaterial.' " (*Sixth Dist. Agr. Ass'n. v. Wright* (1908) 154 Cal. 119, 130; see *Hoadley*, *supra*, 50 Cal. 265, 275-276 [when land is

13

dedicated to public use, the public entity's title cannot be extinguished by adverse possession and no statute of limitations applies].)

The nature of the essential legal questions about interpreting the language of section 219 in this context, as discussed in both sets of moving papers, allows us to conclude that the trial court and this court have both been given an adequate basis in the record to identify and resolve the dispositive issues raised in the complaint. The two matters addressed at the hearing, as well as the reconsideration motion, involve closely related "cross-over" issues of law.

By letter before oral argument, we requested that the parties discuss whether the filing of the City's answer, including its affirmative defenses, affected the City's entitlement to dismissal of the complaint. In response to our request, the attorney representing the City pointed to the affirmative defense it raised to the only cause of action pled against it, declaratory relief, which asserted a failure to state sufficient facts to constitute a cause of action. Appellant responded that factual matters may remain to be litigated, on whether the City's actions in voluntarily seeking voter approval of transactions concerning a different set of former Pueblo lands should estop it from claiming that it was not required to do so in this instance.

Under all the relevant circumstances, it was not essential for the City to join in the Landlord Defendants' demurrer, in order for it to be entitled to defend the dismissal judgment it obtained against this appeal. The City was seeking in the answer on file to have the complaint dismissed, for failure to state its causes of action that were all based on alleged noncompliance with City charter provisions. (See *Coshow*, *supra*, 132

14

Cal.App.4th 687, 701-703 [trial court's inherent powers to control the progress of the proceedings allowed the court to construe motions in limine concerning critical evidence that was justifiably excluded, as equivalent to motion for judgment on the pleadings, establishing that no viable cause of action could be stated].)

We rely upon the affirmative defenses pled by the City as raising the same issues of law litigated in the demurrer, concerning the validity of the master lease in light of charter provisions. We shall construe the City's answer and opposition to Appellant's motion for a preliminary injunction as effectively the same as a City motion for judgment on the pleadings. (*Coshow*, *supra*, 132 Cal.App.4th 687, 701-703.)

With that approach, and assuming without deciding that neither standing concerns nor limitations problems are dispositive here, we next analyze the questions of law underlying the claims against all Respondents, regarding the applicability and effect of section 219 upon the "Pueblo lands" as they are described in this set of pleaded facts.

B. Rules of Review: Demurrer, Judgment on the Pleadings, Reconsideration

The dismissal judgment determined that Appellant cannot set forth sufficient facts to support its declaratory relief and related causes of action for invalidation of the master lease, on its current theory of noncompliance with the cited charter provisions, as to all Respondents. We review that trial court conclusion under the rule that a demurrer tests the legal sufficiency of the complaint. (*Grinzi v. San Diego Hospice Corp.* (2004) 120 Cal.App.4th 72, 78-79 (*Grinzi*); *Blank v. Kirwan*, *supra*, 39 Cal.3d 311, 318.) "[W]e review the complaint de novo to determine whether it contains sufficient facts to state a cause of action. [Citation.] 'We treat the demurrer as admitting all material facts

15

properly pleaded, but not contentions, deductions or conclusions of fact or law.' [Citation.] The trial court exercises its discretion in declining to grant leave to amend. [Citation.] If it is reasonably possible the pleading can be cured by amendment, the trial court abuses its discretion by not granting leave to amend. [Citation.] The plaintiff has the burden of proving the possibility of cure by amendment." (*Grinzi, supra,* at p. 79.)

"Judgment on the pleadings is similar to a demurrer and is properly granted when the 'complaint does not state facts sufficient to constitute a cause of action against [the] defendant.' " (*Coshow*, *supra*, 132 Cal.App.4th at p. 702; Code Civ. Proc., § 438, subd. (d) [grounds for the motion must appear on the face of the challenged pleading or from matters that may be judicially noticed].) "The trial court accepts as true all material facts properly pleaded but does not consider conclusions of law or fact, opinions, speculation, or allegations contrary to law or facts which are judicially noticed." (*Coshow*, *supra*, at p. 702.)

In demurrer analysis, we test the sufficiency of the plaintiff's pleading against the relevant principles of law. (*Marina Tenants Assn.*, *supra*, 181 Cal.App.3d at p. 127.) " 'As a reviewing court we are not bound by the construction placed by the trial court on the pleadings but must make our own independent judgment thereon, even as to matters not expressly ruled upon by the trial court.' [Citation.] [¶] Other relevant matters which are properly the subject of judicial notice (Evid. Code, § 452) may be treated as having been pled." (*Marina Tenants Assn.*, *supra*, at p. 132, citing *Helix Land Co., supra,* 82 Cal.App.3d at p. 937.)

16

These rules presuppose " 'that a complaint otherwise good on its face is nevertheless subject to demurrer when facts judicially noticed render it defective. . . . The theory is that the pleader should not be allowed to bypass a demurrer by suppressing facts which the court will judicially notice.' " (*Marina Tenants Assn.*, *supra*, 181 Cal.App.3d at p. 130.)

In reviewing the demurrer dismissal, we consider whether the allegations may state a cause of action under any possible legal theory. (*Grinzi*, *supra*, 120 Cal.App.4th 72, 85 ["Under these circumstances, new theories may be advanced for the first time on appeal."]; *People ex rel. Brown v. Powerex Corp.* (2007) 153 Cal.App.4th 93, 112 ["A party may propose amendments on appeal where a demurrer has been sustained, in order to show that the trial court abused its discretion in denying leave to amend."]; see *Economic Empowerment Foundation v. Quackenbush* (1997) 57 Cal.App.4th 677, 684, fn. 5; *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1035 ["Where a demurrer is sustained without leave to amend, the reviewing court must determine whether there is a reasonable probability that the complaint could have been amended to cure the defect; if so, it will conclude that the trial court abused its discretion by denying the plaintiff leave to amend."]; *Kruss v. Booth* (2010) 185 Cal.App.4th 699, 712; *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747 [no leave to amend necessary if complaint is facially incapable of amendment].)

On appeal, Appellant has proposed new amendments to more fully bring the parcels subject to the master lease within the arguable scope of the charter provision, in an attempt to cure the defects in the complaint. (*Grinzi*, *supra*, 120 Cal.App.4th 72, 85.)

We will also take into account the legal issues surrounding Appellant's asserted ground for seeking reconsideration of the trial court's ruling, i.e., that because of its disparate treatment of other Pueblo land properties, the City could be estopped from denying that voter approval would be required for this transfer. All of Appellant's arguments present the same core legal issues, which require de novo interpretation and application of the charter language on City ownership of "Pueblo lands."

III

*DECLARATORY RELIEF CLAIMS V. ALL RESPONDENTS*

We next address the declaratory relief issues about the applicability of section 219 requirements to the pleaded facts about the master lease, in light of the background history of ownership of the parcels. We identify the applicable principles for charter interpretation and analyze the record accordingly.

A.  Nature of Requested Relief

" ' "The fundamental basis of declaratory relief is the existence of an actual, present controversy over a proper subject." ' [Citations.] The language of Code of Civil Procedure section 1060 appears to allow for an extremely broad scope of an action for declaratory relief: [¶] 'Any person interested under a written instrument . . . or under a contract, or who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . for a declaration of his or her rights and duties in the premises, including a determination of

any question of construction or validity arising under the instrument or contract.' " (*Otay Land Co. v. Royal Indemnity Co.* (2008) 169 Cal.App.4th 556, 562 (*Otay Land Co.*).)

In the context of a demurrer, the courts evaluate whether the factual allegations of a complaint for declaratory relief reveal that an actual, ripe controversy exists between the parties. (*Otay Land Co., supra*, 169 Cal.App.4th 556, 562-563.) A matter is not justiciable or appropriate for resolution through declaratory relief unless the proper criteria are present, that there is "an actual controversy that is currently active," and both standing and ripeness are appropriate criteria in making that determination. (*Id*. at p. 563.) In applying the basic criteria, we evaluate "the nature of the rights and duties that plaintiff is asserting, which must follow some recognized or cognizable legal theories, that are related to subjects and requests for relief that are properly before the court." (*Ibid*.)

The rights asserted by Appellant pertain mainly to the dispute with the Landlord Defendants about rent increases allowed by the master lease and subleases, and Appellant seeks to avoid those increases primarily through a declaration invalidating the master lease for the parcels. We explore Appellant's claims about the master lease's degree of compliance with section 219 requirements, in light of the meaning and purpose of those charter requirements.

B.  Rules of Charter Interpretation

Accepted methods of statutory construction apply to charter provisions. (*DeYoung, supra*, 147 Cal.App.3d 11, 17.) Determining the meaning of a statutory standard requires the resolution of a question of law. (*People ex rel Lockyer v. Shamrock*

*Foods Co.* (2000) 24 Cal.4th 415, 432.) "The soundness of the resolution of such a question is examined de novo." (*Ibid.*) The superior court was required to apply statutory standards to the pleaded facts, as we do, in examining the plain language of this section to ascertain its applicability. (*City of Poway v. City of San Diego* (1991) 229 Cal.App.3d 847, 859-860.) Recourse to legislative history is proper, if necessary to ascertain legislative intent. (*Ibid.*)

Charter provisions "are construed in favor of the exercise of the power over municipal affairs and 'against the existence of any limitation or restriction thereon which is not expressly stated in the charter . . . .' [Citations.] Thus, '[r]estrictions on a charter city's power may not be implied.' " (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 171 (*Domar Electric, Inc.*); *DeYoung, supra*, 147 Cal.App.3d at p. 17.)

To select the proper interpretation, we first turn to the apparent purpose of the provision, looking to the plain language used. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["plain meaning" rule].) Where that does not suffice, " ' "The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction." ' " (*DeYoung, supra*, 147 Cal.App.3d at p. 18.)

C. History and Scope of Section 219; Its Arguable Ambiguity

In *DeYoung, supra*, 147 Cal.App.3d 11, 19-21, this court set forth the relevant historical development of section 219. In the original Freeholders' Charter of San Diego of 1889, the predecessor section of section 219 (§ 50) allowed the City to sell or lease all Pueblo lands without significant restrictions. For many years, that privilege was very

20

freely used and abused by City authorities, allowing Pueblo lands to be taken by adverse possession or sold off very cheaply. (See *Richert, supra*, 109 Cal.App. 548, 555-559, citing *Ames v. City of San Diego, supra*, 101 Cal. 390, 395 [adverse possession allowed of Pueblo lands].)

In 1909, former section 50, subdivision (a) was amended to "reserve from sale," or conveyance, those northern "Pueblo Lands owned by The City" until 1930, unless there were compliance with new procedures that required a council ordinance that was ratified by City voters. At the same time, section 50, subdivision (b) allowed the City council to sell or lease "all *other lands* now or hereafter owned by the said city not dedicated or reserved for public use," at public auction. (Italics added; *DeYoung, supra*, 147 Cal.App.3d 11, 19-21.)

In 1915, the same provision of the charter applicable to transfers of northern Pueblo lands was amended and renumbered to section 48, to add a 15-year limitation on leases of them. The same requirements, authorization by City ordinance and voter ratification, were retained and remained in effect through 1930 (later extended to 1940). (*DeYoung, supra*, 147 Cal.App.3d at pp. 20-21.)

After 1929 amendments, a new City charter was approved in 1931, extending and renumbering to section 219 those enacted restrictions on sale or lease of northern Pueblo lands owned by the City, by requiring council approval and voter ratification of sales, but without specifying an expiration date (previously 1930-1940). Current section 219 "in essence reenacts and recodifies former section 48," and imposes a 15-year limitation upon lease terms. (*DeYoung, supra*, 147 Cal.App.3d at p. 21.) However, in that case, we

21

held that the 15-year limit on Council issued leases of Pueblo lands was inapplicable, if voter approval of a longer lease had also been obtained. (*Id.* at p. 22.)

Appellant admits in the opening brief that "it could be argued in the abstract" whether section 219 still applies to Pueblo land parcels that the City *reacquired,* after they had been conveyed to and among other owners, out of City hands. Appellant seeks to amend to allege that section 219 applies "in this particular situation," to impose protected status against any City lease of these northern Pueblo lands without voter approval.!AOB 3, RT 39, RB 41)!

The Landlord Defendants concede there is potential ambiguity in section 219's words regarding ownership ("Pueblo Lands owned by The City"). (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1495 [latent ambiguity exists where extrinsic evidence creates a necessity for interpretation, or a choice among two or more possible meanings]; *Economic Empowerment Foundation v. Quackenbush, supra*, 57 Cal.App.4th 677, 685.) They say this phrase "could have at least two meanings, based upon the contentions of the parties in this case." (*City of Poway, supra*, 229 Cal.App.3d 847, 859-860 [recourse to legislative history may be made to ascertain legislative intent].)

On review, the question becomes, what period of ownership by the City of the subject parcels is necessary for the operative language of section 219 to apply and thus to forbid the lease transfer of them as "Pueblo Lands *owned by The City,*" unless voter approval is obtained?

## D. Judicial Notice

Judicial notice includes "the fact of a document's recordation, the date the document was recorded and executed, the parties to the transaction reflected in a recorded document, and the document's legally operative language, assuming there is no genuine dispute regarding the document's authenticity. From this, the court may deduce and rely upon the legal effect of the recorded document, when that effect is clear from its face." (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 265 (*Fontenot*).)

Previously, we notified the parties we were considering taking judicial notice of specified deeds and judgments, on our own motion. (Evid. Code, §§ 459, subd. (c); 455, subd. (a).) We now address the Landlord Defendants' request for judicial notice on appeal of exhibits they and the City previously lodged with the trial court (motion contains an exhibit A table, listing items Nos. 1 through 99 [with a few gaps]).[6] We considered the opposition filed to the motion for judicial notice and heard the parties' views at oral argument.

First, the Landlord Defendants request judicial notice of their previous exhibits to declarations, the recorded deeds showing that the City transferred these parcels to private ownership beginning in the 1860's. The Landlord Defendants supplied to the trial court their lodged exhibits Nos. 2, 3, 4A, 4B (the 1868-1873 conveyances away from the City), and Nos. 4c through 32 (1873-1940 non-City title holders). The City supplied documents

---

[6] In the exhibit A list that was supplied as an attachment to the motion for judicial notice, there is no document corresponding to any requested item numbers 70 through 71, 74 through 76, 82, 86, 89, or 92 through 98.

23

showing the 1855 sales by City to the railroads, and exhibit No. 1, the 1874 U.S. Patent deed to the City. Additionally, the City lodged versions of section 219, from 1909 and 1929, to the present. (Evid. Code, § 452, subd. (c) [official government acts].)

Next, the Landlord Defendants seek judicial notice of their previously lodged exhibits, Nos. 33 through 38 (the 1941-1943 federal condemnation judgments). In 1959, the federal government issued a quitclaim deed for the parcels to the City, with associated maps. At the trial level, the Landlord Defendants requested judicial notice of those maps. On appeal, they have additionally sought judicial notice of exhibit No. 39, the deed itself. The trial court's order does not expressly show whether any judicial notice requests were granted. We can assume the trial court took notice of mandatory items, or discretionary material for which notice was given at the trial level. (Evid. Code, § 453.)

It is well accepted that when courts take judicial notice of the existence of court documents, the legal effect of the results reached in orders and judgments may be established. (*Fontenot, supra,* 198 Cal.App.4th at p. 265; *Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 130, fn. 7; see *People v. Harbolt* (1997) 61 Cal.App.4th 123, 127 [no authority found that an appellate opinion affirming a conviction is not part of the "record of conviction"].) It is not disputed that the same parcels at issue in the complaint are those described in the copies provided of the 1940's eminent domain judgments. Likewise, the same properties were the subject of the earlier transfer deeds involving the railroads and others, and the 1959 quitclaim deed, in the documents provided.

We grant the motion as to the dispositive title documents. (Evid. Code, §§ 455, subd. (a); 459, subd. (c).) These include the Landlord Defendants' exhibits Nos. 2, 3, 4A,

24

4B (the 1868-1873 conveyances away from the City), and Nos. 4c through 32 (1873-1940 non-City title holders). We also take judicial notice of the City's title and charter documents (the 1855 sales by City to Railroad and exhibit No. 1, the 1874 U.S. Patent deed to the City; and the 1909, 1929 and current versions of § 219). Further, we grant judicial notice of exhibits Nos. 33 through 38 (the 1941-1943 federal condemnation judgments), and exhibits Nos. 39 through 41 (federal government quitclaiming the property to the City; i.e., motion granted as to all requested items Nos. 1-41).

With respect to the Landlord Defendants' request for judicial notice on appeal of lodged exhibits Nos. 52 through 57, 60 through 61, 80, 84 (i.e., newspaper articles and historical articles and brochures that are not recorded documents), it is arguable whether they clearly fall within the provisions of Evidence Code section 452, subdivision (h), as "facts and propositions that are not reasonably subject to dispute" that are "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (*Ibid*.; 1 Witkin, Cal. Evidence (5th ed. 2012) Judicial Notice, §§ 32-33, pp. 138-142.) Under Evidence Code section 452, subdivision (h), it is discretionary with this court whether to take judicial notice of such historical articles, and in any case, we would not take judicial notice of the truth of those views. The motion for judicial notice is denied in part, as to exhibits Nos. 52 through 57, 60 through 61, 80, 84 (newspaper articles and historical publications).

As to the balance of the motion, it is granted, including its exhibit No. 64, the City Attorney opinion, No. 99-2 (the "1999 opinion"), that was issued in a dispute about different Pueblo lands properties that had likewise been transferred outside of City

25

ownership, and then back again.  (Evid. Code, § 452, subd. (c) [official acts of governmental agency].)  Other appropriate requests that are granted include exhibit No. 43, a City Attorney opinion, and the City planning commission maps and documents about the parcels and the master lease, as well as City council resolutions about low income housing proposals, identifying these parcels and this site, and legislative acts (i.e., exhibits Nos. 42-51, 58-59, 62-69, 72-73, 77-79, 81, 83, 85, 87-88, 90-91, 99).

E.  Section 219 Interpretation:  Historical Context of Charter Amendments

We can now determine as a matter of law whether Appellant's assertions and proposed amendments about the applicability of section 219 to these leased parcels are supported by this record and the applicable legal principles.  If instead, they would merely amount to conclusory statements or arguments, the proposed amendments would be inadequate.  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 (*Zelig*).)  We review de novo whether a plaintiff is making "allegations contrary to law or facts which are judicially noticed."  (*Coshow, supra,* 132 Cal.App.4th at p. 702.)

As explained in the City Attorney's 1999 opinion, the language regarding voter approval of property transactions, when affecting northern "Pueblo lands owned by The City," was adopted in 1909 and incorporated into the operative 1931 charter (now § 219; see fn. 2, *ante*).  The amendment of the former charter language in 1909 was made in response to the result in *Ames v. City of San Diego*, *supra*, 101 Cal. 390, in which the Supreme Court upheld an adverse possession decree against Pueblo lands.  (*Id*. at p. 395; see 1999 opinion, p. 5.)  The 1999 opinion concludes that the legislative intent, evidenced

26

in 1909 and continued into section 219, was to protect from impolitic transfers those Pueblo lands that remained in City ownership as of 1909.

The 1999 opinion further states that even if a property's legal description may include the term, "Pueblo lands," section 219 nevertheless applies only to those northern Pueblo lands that were part of the 1874 patent deed from the federal government, and that were still in City ownership when the 1909 amendment was adopted, and that have remained in continuous City ownership to the present. The 1999 opinion concludes that section 219 cannot properly be interpreted so broadly as to encompass northern Pueblo lands regardless of when they were acquired by the City, in light of that apparent legislative intent.

The purpose of the 1999 opinion was to analyze the legislative history of section 219 in a case involving certain other Pueblo lands that also had an interrupted ownership history (from the City, to a non-City owner, back to the City). It opined, "To interpret the provision so broadly as to encompass pueblo lands *regardless of when acquired would lead to the unintended result* of subjecting any property owned or acquired by the City north of the north line of the San Diego River to the Section 219 restrictions." (Italics added.)

Such opinions of a city attorney construing its charter provisions are equivalent to the construction of a statute by officials charged with its administration, and are entitled to consideration in charter interpretation. (*DeYoung, supra*, 147 Cal.App.3d at p. 18; see *Evans, supra*, 38 Cal.4th at p. 9, fn. 5.) Charter provisions should be "construed in favor of the exercise of the power over municipal affairs and 'against the existence of any

27

limitation or restriction thereon which is not expressly stated in the charter . . . .' [Citations.] Thus, '[r]estrictions on a charter city's power may not be implied.' " (*Domar Electric, Inc.*, *supra*, 9 Cal.4th at p. 171.)

The 1999 opinion sets forth a reasonable approach to understanding the effect of section 219. It is not disputed that these parcels left City ownership in the mid-1800's and did not return to it until 1959. To give a very broad reading of the charter term "Pueblo Lands *owned by The City*" would be to imply a charter restriction on the City's power to enter into a lease of property that it did not acquire (or reacquire) until 1959. These parcels were not held in City ownership when the voter approval provisions were added in 1909, and it is unlikely that the framers of the amendment could have been considering these (or any other already transferred parcels) as potentially subject to the amendment, which by its terms restricts *future* transactions on Pueblo lands property still "owned" by the City as of 1909. Section 219 was evidently intended to protect those Pueblo lands remaining in City ownership, as of 1909, from future uncontrolled sales or other acquisitions.

That narrow interpretation of section 219 is consistent with the plain language of the provision regarding ownership, as governing the rights and duties of the City with respect to its own remaining Pueblo lands, determined as of 1909 when the restrictions were imposed. "Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history." (*Domar Electric, Inc., supra*, 9 Cal.4th 161, 171-172.) We agree

with the Landlord Defendants that "section 219 was not intended to protect former City owned Pueblo Lands *re-acquired after the 1909 date of the original provision*."

Even if the "ownership" language of section 219 is arguably ambiguous, we should select the interpretation that is consistent with the apparent intent expressed in the charter history since 1909, that was to prevent transfers of the City's then-remaining Pueblo lands unless approval by ordinance and the voters was obtained. (See *DeYoung, supra*, 147 Cal.App.3d at pp. 20-21.) It would not be consistent with the apparent purpose of section 219 to apply its requirements to parcels, such as these, that were not continuously held in City ownership in 1909 and thereafter.

F. Section 219 Interpretation on Record Showing Chain of Title

We next address Appellant's express or implied claims that even if the City's property rights were severed after the 1850's-era private transfers concerning the parcels, such that section 219 might not apply, it was only a temporary severance of charter protections. Appellant seeks an opportunity for more discovery to clarify factual matters about title transfers of the parcels and to amend the pleadings to assert that the City's rights and obligations, to secure voter approval for transfers pursuant to the charter, still exist despite those transfers and the 1940's eminent domain taking that occurred of the parcels, and that affected (took) the entire property interests of the then-private landowners.

In light of the ownership history of these parcels as laid out in connection with the concurrent preliminary injunction proceedings, and as above, we will not disregard the judicially noticeable materials showing that the federal government obtained full title to

29

this property for almost two decades, then deeded it to the City. The authorities establish that when a complete taking of a property interest pursuant to federal eminent domain occurs, it establishes new title and extinguishes previous interests not specifically excepted by the taker. (*U.S. v. 32.42 Acres of Land, supra*, 683 F.3d 1030, 1034; *Burkhart v. U.S.* (9th Cir. 1955) 227 F.2d 659, 661-662; *U.S. v. Carmack* (1946) 329 U.S. 230, 240-242.) No exceptions to these takings were specified on the face of the judgments.

In *U.S. v. 32.42 Acres of Land, supra,* 683 F.3d 1030, the court was concerned with a dispute between the federal government and the California State Lands Commission (the Commission) over land formerly owned by the Commission. The Commission unsuccessfully argued its public trust rights to some of the lands (as tidelands) had survived a taking by the federal government, although the government had paid just compensation for the property. The court concluded any such state rights were extinguished, and no such " 'quiescent' " rights would reemerge for the Commission, such as if the United States later sought to transfer the property to a private party. (*Id.* at p. 1038; 11 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 30A:4, p. 30A-8, and 2014-2015 supp., p. 53.)

Our de novo pleadings interpretation of the language of the complaint properly takes into account these judgments and deeds affecting the title history of the property. (*U.S. v. 32.42 Acres of Land, supra,* 683 F.3d 1030, 1034.) As a matter of law, not only the pre-1909 break that occurred in the chain of title between the periods of the City's ownership of the parcels, but also the later taking by eminent domain, operated to

extinguish the section 219 requirement for voter approval of this master lease concerning these parcels. Once the 1940's eminent domain taking was accomplished, the property interests that could be conveyed back to the City by the federal government did not include the allegedly appurtenant City charter restrictions.

Even assuming there is some ambiguity in the ownership language of section 219, the eminent domain taking was definitive and defeated any potential applicability of the 1909 charter restrictions in this respect. (*Williams v. Wraxall*, *supra*, 33 Cal.App.4th 120, 130, fn. 7 [judicial notice of the truth of results reached in orders and judgments allowed].) Accordingly, the previous historic characterization of the parcels as Pueblo lands, before they were repeatedly transferred out of City ownership, became inoperative for purposes of charter interpretation, as construed in light of judicially noticed materials. The legal effect of the documents' language is clear and not reasonably subject to dispute. (*Fontenot, supra,* 198 Cal.App.4th at p. 265.) It would be fictitious and unduly conclusory to make allegations in the complaint about violation of "binding" charter provisions, since such allegations are defective when viewed in light of contrary facts that are judicially noticeable. (*Evans, supra*, 38 Cal.4th 1, 6.)

Even if we take into account the three examples of reacquired City property (for which voter approval of transactions was sought), that were offered as the subjects of Appellant's reconsideration motion (but without substantive briefing), no different result will obtain. As the Landlord Defendants properly observe, "[S]imply because the City sought voter approval of the transfer and/or exchange of certain other Pueblo Lots at a certain point in time," it did not therefore concede the application of section 219 to all its

31

reacquired property. The City can decide to go beyond charter requirements in going to the voters, but it was not compelled to do so in this instance. We see no indication in the legislative history that the protections of section 219 should reattach to formerly owned City property, if it is ultimately reacquired by the City. (See *DeYoung, supra*, 147 Cal.App.3d 11, 17-18.)

Both to the trial court and at oral argument before this court, Appellant has admitted that it cannot properly allege the City held ownership of these parcels as of the time the provisions of section 219 were enacted, until 1959, when the City regained possession. Appellant cannot show a right to amend its pleading to attempt to bring the parcels within the scope of section 219, as it is properly interpreted in light of its legislative history. Also, Appellant has not established why any governing City legislation or authority would serve the same function of reinstating Pueblo lands protections on reacquired property, nor suggested why its estoppel theory could be successfully pled as based on anything other than a discretionary or nonbinding policy for placing land use matters concerning reacquired property before the voters.

We may not interpret charter restrictions as arising on the basis of implication, such as any implied dormant or " 'quiescent' " obligations retained by the City to seek voter approval of the master lease. (*U.S. v. 32.42 Acres of Land*, *supra*, 683 F.3d at p. 1032; *Domar Electric, Inc., supra*, 9 Cal.4th 161, 170-171.) These parcels have not continuously retained their Pueblo land status over the relevant time periods, and therefore Appellant has not asserted rights and duties that entitle it to declaratory relief on charter interpretation, with respect to any applicable voter approval requirements under

32

section 219. (See *Otay Land Co., supra*, 169 Cal.App.4th 556, 562-563.) The proposed amendments are ineffective conclusory statements that are contradicted by the record. (*Zelig, supra*, 27 Cal.4th 1112, 1126; see *Evans, supra*, 38 Cal.4th at p. 6.) The dismissal of the declaratory relief cause of action was proper as to all Respondents.

IV

*REMAINING STATUTORY AND TORT CLAIMS AGAINST LANDLORD DEFENDANTS*

Appellant's complaint alternatively seeks relief through rescission of the master lease and/or the subleases, or awards of restitution of rents, or tort damages for negligent misrepresentations. Appellant alleges or would amend to allege that the City-owned parcels remained subject to section 219, as "in the nature of" Pueblo lands. It therefore claims the Landlord Defendants and their predecessors had no power to impose the amended rent provisions that allowed yearly rent increases, pursuant to the master lease and the related City resolutions permitting development on the parcels to include low or moderate income housing. Appellant takes the position that its members were being constructively evicted through such "illegal" conduct.

In its statutory causes of action, Appellant sought to restrict the Landlord Defendants from carrying out those allegedly unfair business practices, to raise rents or dissipate services, pending the outcome of these claims. (Bus. & Prof. Code, § 17200 et seq.; Civ. Code, § 798 et seq.) These theories seem to ask the courts, effectively, to compel renegotiation of the rent increase provisions in the master lease, in such a manner as to accomplish rent control for the subleases, all due to alleged invalidity under section 219. However, the key interpretive question of ownership of the parcels at the relevant

33

times must be resolved against Appellant's position. For the same reasons explained above, it would not be consistent with the evident purpose of section 219 to permit the use of these alternative theories in the complaint as vehicles to seek changes in the terms of the master lease.

To the extent the record gives insight into the meaning of section 219, we may look to " ' "matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction." ' " (See *DeYoung, supra*, 147 Cal.App.3d at p. 18.) We believe the City could reasonably interpret section 219 as allowing it to pursue legitimate public policy goals even on historic Pueblo lands, such as leasing these parcels for the purpose of providing low to moderate income housing development, as specified in the lease. As amended, the master lease allows the parties to require regular rent adjustments. Such a policy was recognized in the factual context of *DeYoung* as being fiscally prudent for the City. (*DeYoung, supra,* at p. 22, fn. 6.)

In conclusion, Appellant has not established any entitlement to relief based on its claim that reacquired City Pueblo lands (following periods of severed City ownership rights) somehow remain subject to section 219 requirements for voter approval of property transactions. We disagree with any claim that the trial court failed to use proper procedures in ruling on the various motions. When resolving the pleadings questions, the trial court was not required to ignore the judicially noticeable material presented in connection with the other motion being heard. (Evid. Code, § 452, subds. (c), (d).) The dispositive legal questions as to all Respondents were properly brought before the trial

court in the demurrer proceedings, the companion motion and its record, and in the City's answer on file, and they have been fully presented in this appeal. Judgment on the pleadings was appropriate and the demurrer was properly sustained without leave to amend.

## DISPOSITION

The judgment of dismissal is affirmed as to all Respondents. The motion for judicial notice is granted in part as to all requests, with the exception that it is denied as to exhibits Nos. 52 through 57, 60 through 61, 80 and 84 as they are listed in exhibit A to the motion. Costs are awarded to Respondents.

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

McDONALD, J.

35

Filed 2/9/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LINDA VISTA VILLAGE SAN DIEGO HOMEOWNERS ASSOCIATION, INC., | D064741 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00085269-CU-MC-CTL) |
| TECOLOTE INVESTORS, LLC, et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | |

THE COURT:

The opinion filed January 27, 2015, is ordered certified for publication.

_____
HUFFMAN, Acting P. J.

Copies to: All parties