Filed 4/6/23 P. v. Gonzalez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078023 |
| v. | (Super.Ct.No. FVA022595) |
| SILVESTER JUNIOR GONZALEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Gregory S. Tavill, Judge. Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

In 2003, defendant and appellant Silvester Junior Gonzalez and his brother Miguel Angel Gonzalez (Miguel)—both gang members—shot at two rival gang members, killing one. The two were tried together in 2006; the jury convicted defendant of murder (Pen. Code,[1] § 187, count 1), attempted murder (§§ 664, 187, subd. (a), count 2), and discharging a firearm with gross negligence (§ 246.3, count 3). The jury also found true the gang and firearm enhancements (§§ 186.22, subds. (b)(1), 12022.53, subds. (b), (c), (d), (e)(1)). Defendant was initially sentenced to an aggregate term of 30 years eight months, plus 50 years to life; however, following his petition for writ of habeas corpus, the trial court reduced the first degree murder conviction to second degree (count 1) and sentenced him to an aggregate term of 30 years eight months, plus 40 years to life.

In 2019, defendant filed a petition for resentencing of his conviction of second degree murder (count 1) under former section 1170.95 (now § 1172.6);[2] he argued that he was not the shooter, and the jury had convicted him as an aider and abettor under the natural and probable consequences doctrine. At the evidentiary hearing, the prosecutor, who also tried the case in 2006, relied on the evidence and argued that defendant was the actual shooter for the attempted murder (count 2), but acted as an aider and abettor the murder (count 1). The trial court agreed and concluded defendant was not entitled to resentencing relief for either the murder or the attempted murder. Defendant contends

---

[1] All undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, Assembly Bill No. 200 (2021-2022 Reg. Sess.) amended and renumbered Penal Code section 1170.95 as section 1172.6. (Stats. 2022, ch. 58, § 10.)

the prosecutor used an inconsistent and irreconcilable factual theory at the evidentiary hearing in violation of his constitutional rights and the collateral estoppel doctrine. We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS[3]

### A. *Prosecution Evidence*

Sometime prior to May 20, 2003, members of a rival gang from Los Angeles, the 18th Street gang, fired gunshots at the home where defendant and his brother lived. The victims (Aldo Rodriguez and Albert Sandoval) were members of the 18th Street gang.

### 1. The Shooting

On the afternoon of May 20, 2003, Rudy Leyva drove defendant (identified by witnesses as not wearing a shirt) and his girlfriend to a restaurant in Fontana. At that time, the victims were eating inside the enclosed patio of the restaurant; they were unarmed. Defendant entered the patio, looked at the decedent, exchanged some words, and went back outside. It appeared that defendant was looking for trouble. The decedent told Sandoval, "Man, I know this fool, he came talking shit." Defendant believed that they were two members of the 18th Street gang, which had shot up his house. Defendant and

---

[3] On February 9, 2022, defendant moved to incorporate the record in his prior appeal. (*People v. Gonzalez* (July 3, 2008, E042407) [nonpub. opn.] (*Gonzalez*).) We construed his motion as a request for judicial notice and granted the request on February 18, 2022. On our own motion, we also take judicial notice of our opinion filed in that case. (Evid. Code, §§ 452, subd. (d), 459; Cal. Rules of Court, rule 8.1115(b)(1).) "It is well accepted that when courts take judicial notice of the existence of court documents, the legal effect of the results reached in orders and judgments may be established." (*Linda Vista Village San Diego Homeowners Assn., Inc. v. Tecolote Investors, LLC* (2015) 234 Cal.App.4th 166, 185.)

his girlfriend remained at the restaurant while Leyva drove home to pickup Miguel, who brought a gun.[4]

When the decedent and Sandoval walked outside, defendant then "hit up" Sandoval, asking where he was from. Sandoval replied that he was from 18th Street. Someone yelled out, "West Side," which Sandoval understood to mean the NHL gang. Sandoval knew there had been problems between the 18th Street and NHL gangs, and understood defendant's "hit up" to be a gang-related challenge. At the same time, Miguel retrieved a handgun from Leyva's car; defendant and the decedent were fighting when Miguel fired shots. The decedent "balled up" before he ran across the street. Sandoval also ran but was not struck by any bullets.

After he heard a car "peeling out," Sandoval crossed the street and found the decedent bleeding from his mouth and gasping for air. When police arrived, one witness identified the shooter as wearing a white polo shirt and a white cap (Miguel). The witness saw the guy without a shirt (defendant) begin punching the decedent. He added that the guy in the white shirt (Miguel) gave the gun to the guy without a shirt (defendant), and then the witness heard, "pop, pop again." Another witness who worked at the restaurant saw the man without a shirt (defendant) with a gun in his waistband following the shots.

After Miguel returned home, he appeared nervous, and his girlfriend asked him what was wrong. Miguel said there had been an argument at the restaurant, and he had

---

[4] In defendant's interview with the police, he claimed that Miguel initially accompanied him, his girlfriend, and Leyva to the restaurant, but left to retrieve the gun.

4

shot someone. He explained that he shot the person because he was an 18th Street gang member; she "guess[ed]" his problems with 18th Street gang was that "they [had] shot at him." He also told Ashley he had accidentally shot defendant in the arm because he was in the way even though Miguel told him to move. Miguel told her that he had fired the gun "[t]wo or three times."

### 2. Miguel's Statement

Detectives interviewed Miguel, and a videotape of the interview was played for the jury. Miguel said the 18th Street gang "had a green light" on him. He denied being a member of the NHL, but admitted he hung around them. He explained he brought the gun with him to the restaurant; the victims were acting "all crazy" and were fighting with Silvester. He admitted he "[s]moked" the decedent and chased Sandoval while firing his gun because one of the victims picked up a large rock and tried to hit Silvester with it. He did not know what happened to the gun after the shooting.

### 3. Defendant's Statement

Detectives also interviewed defendant, and a videotape of the interview was played for the jury. He claimed that Miguel initially accompanied him, Crystal, and Leyva to the restaurant. He and Crystal got out of the car to order food, while Leyva and Miguel left to retrieve the gun. Leyva had recognized one of the victims in the restaurant as an 18th Street gang member. Prior to Leyva and Miguel leaving to retrieve the gun, Leyva and the victims were "[m]addogging" each other. While Leyva and Miguel were gone, the decedent and Sandoval walked outside the restaurant and got "all crazy on" defendant who began fighting with them. During the fight, Miguel and Leyva returned,

5

saw the fight, and retrieved the gun. Defendant heard shots; everyone ran, and one of the victims eventually fell.

After the shooting, defendant noticed he had been shot in the right forearm, and Miguel apologized to him for shooting him. Before Miguel fired the gun, he told defendant to "watch out" but he did not hear Miguel. Defendant knew the victims were from the 18th Street gang, and he wanted to ask them what the "problem" was before Leyva and Miguel returned with the gun. He said he fought with the victims in self-defense after they "came at [him]."

### 4. Gang Expert Testimony

Sergeant Green testified as an expert on criminal street gangs. He testified that Miguel admitted to being a West Side Fontana Neighborhood Locos, or NHL, gang member, and he opined that defendant was an active or associate NHL member. He stated that the 18th Street gang was one of the largest gangs in Los Angeles, with several hundred members, and that a "green light" signified a person who had been marked for harm, including death.

### B. Closing Argument and Jury Deliberations.

Prior to closing arguments, defense counsel moved to dismiss all charges against defendant on the grounds of insufficient evidence of aiding and abetting. Defense counsel noted the prosecution's theory of aiding and abetting may be broken down into actual aiding and abetting, or natural and probable consequences. Counsel acknowledged the viability of a "straight aiding and abetting" theory; however, he argued the natural and probable consequences theory fails in terms of defendant's mental state and constitutional

6

ramifications.[5]  Thus, counsel asked the trial court to require the district attorney "to make an election in that if it is premised again on the natural and probable consequences of it, the jury has to be instructed that they have to find that the mental state of the specific intent is reasonably foreseen in order to convict [defendant] as it would be a natural and probable consequence of, as the People would put it, an assault."  In response, the prosecutor argued that both theories apply and a witness identified defendant as the person with the gun at the scene.  The court denied the motion to dismiss and declined to require an election by the People.

In closing, the prosecutor argued that defendant initiated the confrontation with the victims, talked to Miguel about getting the gun, Miguel left and returned a few minutes later, and then defendant confirmed his targets by asking the victims, "'Where are you from?'"  The prosecutor pointed out that Miguel admitted that he fired shots.  Thus, the prosecutor argued defendant was guilty of aiding and abetting the murder because he "instigated" the situation by asking the victim where he was from, being present when the decedent was shot, and fleeing with the shooter.  The prosecutor later stated that defendant and Miguel "located the victim, they knew what was going to happen, *the gun was passed and there were two witnesses that told you* [(*the jury*)] *that both defendants*

---

[5]  Defense counsel argued the theory violates defendant's "due process rights and a right to a fair trial" because "[i]n allowing the natural and probable consequences to go forward on the murder and attempted murder, which is primarily based upon the intent of the co-defendant, [the theory] does away with the specific intent of my client altogether and that would be a violation of the same grounds."

*handled the gun*, that tells you right there, he is guilty as an aider and abettor and you don't have to talk about natural and probable consequences." (Italics added.)

Maintaining that defendant was guilty for both reasons, the prosecutor also argued the case started as an assault, a fight, and "what you [(the jury)] have to decide is, was what happened in this case a natural and probable consequence of that initial turning around and socking. You must decide if an assault occurred. There is evidence to show you that it did. Then you must decide if the murder . . . , the attempted murder . . . , and the negligent discharge of the firearm [are] the natural and probable consequence of the action of [defendant]."

Finally, the prosecutor maintained: "Again aiding and abetting is a theory in and of itself to show both of these defendants, they were in this together and, in fact, the fact that [defendant] left with the gun tells you, and I suppose since—after he's been shot, his brother shoots him, he takes the gun and you heard the evidence about the conversation in the car, you shot me, what are you doing? He took the gun from his younger brother. They are in it together. He is an aider and abettor. [Defendant] is. Not only because the natural and probable consequences dictum, this is what's going to happen, but also because he was actively involved and knew what the plan was. They talked about it."

During deliberations, the jury asked if they could rely upon aiding and abetting to conclude that Miguel personally discharged a firearm in count 2, attempted murder.[6] The trial court replied, "You may use the aiding and abetting principle for either defendant." Shortly thereafter, the jury returned guilty verdicts and true findings.

*C. Direct Appeal.*

In the direct appeal from the jury trial, this court concluded the trial court erred when it informed the jury that it could rely on aiding and abetting to conclude Miguel personally discharged a firearm in count 2. (*Gonzalez*, *supra*, E042407.) In analyzing prejudice, this court explained how the jury could have reasonably believed that defendant, rather than Miguel, acted as the shooter in count 2:

"Here . . . one prosecution witness . . . indicated he saw Miguel hand the gun to [defendant] after Miguel fired the initial shots, and that [defendant] then fired more shots. [The witness] also said that, when Miguel fired the initial shots, [defendant] was fistfighting with [the decedent]. This evidence indicated to the jury that either Miguel and/or [defendant] may have personally discharged a firearm in count 2. The evidence also showed that [defendant] was a principal in the commission of count 2 and aided and abetted Miguel in the commission of count 2. And, aside from Miguel's admission to the

---

**6** Specifically, the jury asked: "[F]or Miguel, can we arrive to a decision in count 2, 1st allegation, with the use of the aiding and abetting principal?" The first allegation in count 2 provides: "It is further alleged as to count(s) 2 that a principal personally and intentionally discharged a firearm, a handgun, within the meaning of Penal Code sections 12022.53(c) and (e)(1). [¶] It is further alleged as to count(s) 2 that a principal personally used a firearm, a handgun, within the meaning of Penal Code sections 12022.53(b) and (e)(1)."

9

police that he fired the gun at [the decedent] and Sandoval, the eyewitness identifications of Miguel as the shooter were rather questionable. Reasonable jurors also could have believed that Miguel admitted to the shooting in order to protect [defendant] and Leyva." (*Gonzalez, supra*, E042407.)

"Moreover, the jury's question to the court—whether the jury could rely on aiding and abetting principles in finding the personal discharge allegation true against Miguel in count 2—rather clearly indicated that the jury was not unanimously or entirely convinced that Miguel personally discharged a firearm in count 2. And the court's response—that the jury could rely on aiding and abetting principles in finding that Miguel personally discharged a firearm in count 2—in combination with the evidence of [defendant's] role in the shooting, indicates that the jury may well have relied on aiding and abetting principles in finding that Miguel personally discharged a firearm in count 2." (*Gonzalez, supra*, E042407.)

"The timing of the jury's note and the trial court's response in relation to the jury's verdicts also indicates that the jury may well have relied on aiding and abetting principles in finding that Miguel personally discharged a firearm in count 2. The jury submitted its note to the court at 10:22 a.m. on August 17, the seventh day of deliberations. The trial court responded to the note by 10:44 a.m. By 11:19 a.m., the jury had reached its verdicts." (*Gonzalez, supra*, E042407.)

10

*D. Defendant's Petition for Writ of Habeas Corpus.*

In 2017, defendant filed a petition for writ of habeas corpus in the superior court challenging the first degree murder conviction in light of *People v. Chiu* (2014) 59 Cal.4th 155, superseded by statute as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959. After requesting an informal response from the People, the trial court reduced the first degree murder conviction in count 1 to second degree and resentenced defendant to an indeterminate term of 40 years to life.

*E. Defendant's Petition for Resentencing and Hearing.*

In 2019, defendant filed a former section 1170.95 petition (now § 1172.6) for resentencing of his second degree murder (count 1) conviction. He argued the conviction was based "solely" on a natural and probable consequences theory of aiding and abetting liability. Opposing the petition, the People argued that former section 1170.95 does not apply to defendant's attempted murder (count 2) conviction, and they only "have to show the Court, sitting as a fact finder, that there was, and is, sufficient evidence for defendant to be guilty of second degree murder [(count 1)] under direct aiding and abetting." More specifically, the People argued that the court could determine that defendant "acted as a direct aider and abettor in the murder" because (1) he initiated the confrontation by asking the victims about their gang affiliation, (2) he was the leader of the two defendants, (3) Miguel looked up to him and opened fire, hitting the decedent, and (4) he (defendant) took the gun from Miguel and opened fired himself. The People emphasized the testimony of one of the witnesses who observed the brothers' "discussing someone at the location and . . . trying to determine that individual's identity." This witness's

11

testimony "shows they were working together before the confrontation initiated by [defendant] and the resulting shootings." The witness heard the brothers discuss "'grabbin the gat,'" indicating a gun, immediately prior to defendant confronting and assaulting the decedent. The witness added that after Miguel shot the decedent, defendant took the gun and continued to fire. Considering this evidence, the People maintained that defendant "shared the intent to kill and was a direct aider and abettor."

An evidentiary hearing was held on October 14, 2021. The superior court "reviewed the entire trial record," took judicial notice of the court's file, including the petition for writ of habeas corpus, and stated it was the prosecution's burden of proving beyond a reasonable doubt that defendant was ineligible for resentencing. Neither party offered any new or additional evidence at the hearing.

After summarizing the evidence,[7] the prosecutor[8] argued: "I think all of that evidence clearly shows that [defendant] was a direct aider and abettor and was, in fact, not only aware of the gun, there was discussion of planning of what was gonna happen, he engaged the subjects in the—at least one of the victims in a fist fight, and then when

---

[7] The prosecutor noted: (1) witness testimony supports a finding that defendant initiated the confrontation with the victims by asking, "'Where are you vatos from?'"; (2) witness testimony identifies Miguel as shooting and killing the decedent (count 1), and defendant taking the gun from Miguel and shooting multiple times at Sandoval (count 2); (3) evidence indicating that 15-year-old Miguel looked up to defendant, his 21-year-old brother, and would not have shot the first victim "without his brother's approval"; and (4) evidence indicating that defendant and his cohorts discussed the shooting before defendant initiated the attack.

[8] The prosecutor who tried defendant's case represented the People at the section 1172.6 hearing.

[Miguel] had shot the first victim successfully, took the gun in an attempt to kill the second victim, Albert Sandoval, as he ran away. It clearly shows he was a direct aider and abettor and knew there was a gun involved and that there was going to be a shooting."

The superior court questioned how the prosecutor could "reconcile the argument that [he had just made] with the position the district attorneys took in the prior habeas case?" Admitting a different analysis, the prosecutor stated that a different standard applied in the habeas case where he had to prove a negative—that beyond a reasonable doubt, the jury did not rely on natural and probable consequences. In contrast, "[h]ere, you have to find that the jury could have found the defendant guilty beyond a reasonable doubt under the current valid theory. And that's why [he] highlight[ed] . . . that [defendant] was, in fact, a direct aider and abettor."

When directed to his closing argument, the prosecutor stated that he had "argued both theories and, in fact, told the jury that [defendant] was guilty for basically two reasons: That he was, in fact, a direct aider and abettor for all the reasons [the prosecutor] already cited and discussed in [his] closing argument, and . . . based on the law at that time, he was also guilty under the natural and probable consequences." Even so, the superior court initially pointed out that he (the prosecutor) had "argued to the jury that basically [defendant] did not know this would turn into a shooting and a death"; but then noted the prosecutor's reference to "the gang connection and that a simple assault would not be an appropriate retaliation for someone shooting at [defendant's] house." Thus, the court conceded, "[t]hat's part of the analysis in terms of direct aiding and abetting."

13

In response, defense counsel acknowledged the prosecution's use of two theories—direct aiding and abetting and natural and probable consequences—but argued that natural and probable consequences is no longer viable, and the evidence is insufficient to prove beyond a reasonable doubt that defendant directly aided and abetted the murder.

At the conclusion of the hearing, the superior court found beyond a reasonable doubt that defendant was the actual shooter in the attempted murder conviction, and he "did act with an actual intent to kill when he aided and abetted the murder of Aldo Acosta Rodriguez." Thus, it denied the petition for resentencing.

## II. DISCUSSION

"Senate Bill 1437 [(2017-2018 Reg. Sess.)] was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Cortes* (2022) 75 Cal.App.5th 198, 203.) Also, the Legislature enacted section 1172.6 (former § 1170.95) to provide the procedure by which a defendant convicted of murder under a natural and probable consequences theory can request that his/her conviction be vacated. (*People v. Solis* (2020) 46 Cal.App.5th 762, 775.)

After the issuance of an order to show cause, the trial court sits as a trier of fact on defendant's petition for resentencing. In determining whether a trial court correctly denied such petition after an evidentiary hearing, an appellate court reviews """"the

14

factual findings for substantial evidence and the application of those facts to the statute de novo.""'"" (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.) Accordingly, "we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) In conducting this review, we do not resolve evidentiary conflicts or credibility issues. (*Owens*, at p. 1022.)

Defendant petitioned to resentence his conviction of second degree murder (count 1) pursuant to section 1172.6 on the grounds that the conviction was based on the natural and probable consequences doctrine. At the hearing, his counsel argued the evidence was insufficient to prove beyond a reasonable doubt that defendant directly aided and abetted the murder. On appeal, defendant does not challenge the trial court's findings. Rather, he contends "the judgment should be reversed and the matter remanded for a new evidentiary hearing because the prosecutor's use of an inconsistent and irreconcilable factual theory at trial and at the evidentiary hearing violated his right to due process and the collateral estoppel doctrine insofar as the jury returned verdicts and findings reflecting Miguel personally used and personally discharged a firearm in committing both the murder and attempted murder." Recognizing that this claim is forfeited due to his counsel's failure to raise it below, defendant contends he received ineffective assistance. We conclude his claims lack merit.

15

At an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), the trial court sits as an independent factfinder and considers the evidence of the defendant's guilt anew, including any new evidence the parties may offer, in order to determine whether the defendant is guilty under current law. The court may also consider new theories of liability not presented at trial. (*People v. Duchine* (2021) 60 Cal.App.5th 798, 813 ["By allowing new evidence and providing for an evidentiary hearing, the Legislature plainly intended that the issues concerning whether the defendant was guilty under theories of murder not previously or necessarily decided would be resolved anew, through a factfinding process affording a degree of due process to the petitioner."]; accord, *People v. Schell* (2022) 84 Cal.App.5th 437, 444-445.) "Interpreting section 1172.6 to allow the prosecution to present different theories of guilt at the evidentiary hearing does not implicate constitutional concerns. Courts have unanimously held that section 1172.6 is an act of lenity in which the petitioner has no Sixth Amendment right to a jury trial. [Citation.] It has also been recognized that allowing the prosecution to offer new theories of guilt at the hearing does not implicate double jeopardy concerns. [Citation.] [¶] Although [defendant] contends that allowing the prosecution to present a new theory of guilt in this context implicates his due process rights, he had a full and fair opportunity to present new and additional evidence at the evidentiary hearing but declined to do so. . . . '[B]ecause a section [1172.6] evidentiary hearing does not subject a defendant to the risk of additional punishment, is not a trial, permits both parties to present new evidence, and merely considers whether the defendant's request for leniency meets the necessary

16

criteria, there is no constitutional problem in allowing new theories of murder liability at that hearing.'" (*Schell*, at pp. 444-445.)

Notwithstanding the above, the focus of the trial court's inquiry was to determine whether the prosecution could establish, beyond a reasonable doubt, that defendant remains guilty of second degree murder and attempted murder absent the natural and probable consequences doctrine. The prosecution maintained its theory of aiding and abetting while highlighting the evidence that also supports a finding that defendant was the shooter in the attempted murder. The court considered the evidence and found that defendant was the direct perpetrator of the attempted murder. This conclusion is supported by the evidence and the jury's requests/question during deliberation.

According to the trial record, the prosecutor argued liability on an aiding and abetting theory; however, the jury asked whether they could rely on aiding and abetting principles to conclude that Miguel personally discharged a firearm in count 2, attempted murder. Immediately prior to that question, the jury requested a readback of the testimony of two witnesses, the girl who was taking orders at the restaurant and the mother who was waiting for her daughter to receive their food order. Both witnesses identified defendant as the one with the gun. The mother identified him as the shooter. Our opinion from defendant's direct appeal stated: "The timing of the jury's note and the trial court's response in relation to the jury's verdicts also indicates that the jury may well have relied on aiding and abetting principles in finding that Miguel personally discharged a firearm in count 2. The jury submitted its note to the court at 10:22 a.m. on August 17,

17

the seventh day of deliberations. The trial court responded to the note by 10:44 a.m. By 11:19 a.m., the jury had reached its verdicts." (*Gonzales*, *supra*, E042407.)

The prosecution's suggestion that defendant was the direct perpetrator of the attempted murder (count 2) was not based on any new evidence, and the primary theory of defendant's liability for murder (count 1) was aiding and abetting. Regardless of its rationale in denying resentencing on count 2, the trial court expressly stated its reason for denying the petition—defendant "did act with an actual intent to kill when he aided and abetted the murder of Aldo Acosta Rodriguez [(count 1)]." The record supports the court's decision.[9]

### III. DISPOSITION

The order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
Acting P. J.

We concur:

MILLER_____
J.

CODRINGTON_____
J.

---

[9] Given our conclusion on the merits of defendant's claim, we need not address the alternative issue of ineffective assistance of counsel.

18