Filed 5/8/23

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| Conservatorship of the Estate of THOMAS S. TEDESCO. <br><br> GLORIA TEDESCO, <br><br> Petitioner and Appellant, <br><br> v. <br><br> LAURA K. WHITE, et al, <br><br> Defendants and Respondents. | E077664 <br><br> (Super.Ct.No. INP1400272) <br><br> OPINION |

APPEAL from the Superior Court of Riverside County. John G. Evans, Judge. Affirmed.

Herzog, Yuhas, Ehrlich & Ardell, Ian Herzog and Evan D. Marshall for Petitioner and Appellant.

Sheppard, Mullin, Richter & Hampton, Adam F. Streisand, Nicholas Van Brunt and Valerie E. Alter for Defendants and Respondents Laura K. White, Julie M. Bas, and Sandra L. Kay.

1

Freeman, Freeman & Smiley, Geraldine A. Wyle, Jeryll S. Cohen, Kevin Bryce Jackson, and Thomas C. Aikin for Defendant and Respondent David M. Wilson.

In 2015, a conservatorship of the estate of Thomas Tedesco, a wealthy nonagenarian (Thomas), was created, and Thomas requested the appointment of respondent David M. Wilson, an independent professional fiduciary, as conservator of the estate. Thomas's second wife, Gloria Tedesco (Gloria) was present at the August 10, 2015 hearing and stipulated on the record, through counsel, to Wilson's appointment. Approximately six years later, on March 23, 2021, Gloria petitioned the probate court to vacate the order creating the conservatorship, along with all subsequent orders "emanating" from the conservatorship. The court denied the petition, and she appeals. Through a myriad of disjointed arguments, Gloria challenges the probate court's order striking her petition to vacate all the orders in this conservatorship, including the establishment of the conservatorship and appointment of Wilson as the conservator. We affirm.

# I. PROCEDURAL BACKGROUND AND FACTS[1]

## A.    *Background History of the Parties.*

Thomas is a wealthy nonagenarian, having amassed more than $40 million in various assets, which were held by TW Tedesco Properties, L.P., a California limited partnership (Tedesco Properties).[2]  (*White v. Wear*, *supra*, 76 Cal.App.5th at pp. 27-28.)  In 1988, he and his late wife created an estate plan to benefit their three daughters, Laura White, Sandra Kay, and Julie Bas, and their grandchildren.  Part of the estate plan included the creation of the living trust and W. Mae, LLC, a California limited liability company (W. Mae).  (*Id.* at pp. 28-29.)

After the death of his first wife, on March 25, 2007, Thomas married Gloria (nee Basara) who had two daughters from a prior relationship, Debra Wear (aka Debbie Basara Wear, herein Wear) and Wendy Basara (Wendy).  Since both Thomas and Gloria

---

[1]  On July 29, 2022, we reserved ruling for consideration with this appeal on respondent Wilson's request for judicial notice filed July 11, 2022.  We have reviewed the request and appellant's opposition.  The request is granted.  We take judicial notice of the opinion in *Tedesco v. White* (June 15, 2022, G059883) [nonpub. opn.] (*Tedesco III*, *supra*, G059883).  (Evid. Code, §§ 452. (d), 459.)

Separately, on this court's own motion and to compile a coherent narrative, we take judicial notice of the records and our prior opinions in:  *Conservatorship of Estate of Tedesco* (Sept. 19, 2019, E070316) [nonpub. opn.], mod. Oct. 7, 2019 (*Tedesco I*, *supra*, E070316); *Tedesco v. White* (Sept. 19, 2019, E069438) [nonpub. opn.] (*Tedesco II*, *supra*, E069438); *White v. Wear* (2022) 76 Cal.App.5th 24; and *White v. Davis* (2023) 87 Cal.App.5th 270.  (Evid. Code, §§ 452, subd. (d), 459; Cal. Rules of Court, rule 8.1115(b)(1).)  "It is well accepted that when courts take judicial notice of the existence of court documents, the legal effect of the results reached in orders and judgments may be established."  (*Linda Vista Village San Diego Homeowners Assn.*, *Inc. v. Tecolote Investors*, *LLC* (2015) 234 Cal.App.4th 166, 185.)

[2]  Thomas was born on April 27, 1926.  On December 31, 2005, his estate was valued at $40,474,997.  (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 27, fns. 1 & 2.)

entered the marriage with multimillion-dollar estates, they executed prenuptial and postnuptial agreements. (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 28.) Also, "[t]here were extensive discussions regarding Thomas's residence. According to Thomas's family/estate plan attorney Burton A. Mitchell (Mitchell), the prenuptial agreement and modifications to Thomas's estate plan grant Gloria a life estate in Thomas's residence [for her lifetime] should she survive him; however, the documents do not bequeath to her fee title to his interest in the residence." (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 277.)

"On February 11, 2011, Thomas appointed his three daughters as his true and lawful attorneys to act in any lawful way for him and his name, place, and stead, and for his use and benefit as authorized. Thus, Thomas's daughters were authorized to transfer trust assets and file any necessary tax returns, and if a conservatorship was needed, they were nominated to serve, acting by majority vote. (*White*, *supra*, 76 Cal.App.5th at p. 28.) Following the creation of W. Mae (Sept. 2012), on December 26, 2012, Thomas gifted the living trust's general partner's interest in Tedesco Properties to W. Mae.[3] (*Tedesco I*, *supra*, E070316) On or about February 20, 2013, Thomas's daughters authorized Wells Fargo Bank, N.A. (Wells Fargo) to change the signer on the Tedesco Properties' account. (*Ibid*.)" (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 277.) The gift

---

[3] Pursuant to Mitchell's letter to Thomas, dated December 12, 2012, the gift documents were signed but left undated, "'so that [the law firm] could date them to be effective once everyone had signed them.'" (*White v. Davis*, *supra*, 76 Cal.App.5th at p. 277, fn. 5.) Mitchell's paralegal "'filled in the date by hand'" to read December 26, 2012, on each signature page. (*Ibid*.)

documents had been sent to Capitol Services for filing with the California Secretary of State on January 3, 2013; however, on March 28, 2013, Mitchell's paralegal was informed that they were rejected because the Secretary of State "'now require[d] not only the signature of the new general partner, but also the signature of the former general partner.'" (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 277.)  "Thus, the paralegal revised the form to add a signature block for Thomas, as former general partner, and faxed the revised form to him for signature.  Thomas signed the revised form and returned it on April 4, 2013.  The amendment to the certificate of limited partnership, which evidences the transfer of the living trust's general partner's interest in Tedesco Properties to W. Mae, was filed with the Secretary of State that same day, April 4, 2013." (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 277.)

"After the gift documents were filed with the Secretary of State, Thomas underwent bladder surgery on April 15, 2013, and back surgery on April 30.  On June 5, 2013, Thomas resigned as trustee of the living trust, and his three daughters began to serve as successor cotrustees. (*White*, *supra*, 76 Cal.App.5th at pp. 28-29.)  Twenty-four days later, on June 29, Thomas signed an amendment to the living trust, prepared by Mitchell, which made the living trust irrevocable and unmodifiable without the written consent of Thomas and his daughters.  (*Id.* at p. 29.)  Thomas underwent a second bladder

surgery on July 30, 2013."**4** (*White v. Davis*, *supra*, 87 Cal.App.5th at pp. 277-278.)

"During the first six years of Thomas and Gloria's marriage, no issues arose regarding Thomas's estate plan, which favored his biological heirs.  However, by fall 2013, after undergoing multiple surgeries, Thomas had become intellectually impaired and susceptible to being unduly influenced.  He ended his decades-long relationship with Mitchell, who stated:  "'[I]t was very difficult to communicate with [(Thomas)], as Gloria seemed to be blocking the calls.  When [Mitchell] called, either [Thomas] was never there or someone else was on the phone.  [Mitchell] related that he heard other voices in the background, particularly Gloria, telling Thomas what to say [and Mitchell] ha[d] seen scripts written for [Thomas] regarding what he [was] to say to

---

**4** Gloria continues to advance facts—Thomas's daughters' alleged fraudulent transfer of control over the trust and misappropriation of personal funds—which she asserts "have been omitted from every opinion and order, and because they invoke the duty of the court to scrupulously examine [Wilson's and Thomas's daughters'] conduct." While Gloria's counsel must zealously advocate on her behalf, the probate court's orders are ""'presumed correct; all intendments and presumptions are indulged to support [it]; conflicts in the declarations must be resolved in favor of the prevailing party, and the [probate] court's resolution of any factual disputes arising from the evidence is conclusive.'" [Citations.]  Hence, we presume the [probate] court found in [respondents'] favor on "all disputed factual issues." . . .  "In viewing the evidence, we look only to the evidence supporting the prevailing party.  [Citation.]  We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact.  [Citation.]  Where the [probate] court has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable."  [Citation.]  "If the [probate] court resolved disputed factual issues, the reviewing court should not substitute its judgment for the [probate] court's express or implied findings supported by substantial evidence."'" (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1115, fn. 9.)  Gloria, however, does precisely what appellate courts may not do by looking only to the evidence favorable to her while ignoring the evidence supporting the probate court's express and implied findings.

6

his attorney.'" (*White*, *supra*, 76 Cal.App.5th at p. 29.) "Around the same time, 'White and her sisters were denied access to their father. A housekeeper . . . confronted Gloria and said, '"'You can't keep the girls from seeing their dad. They're not stupid!'"'" Gloria responded, "I don't care." Gloria told Thomas that his daughters were "being bad" to her, blocked his communication with his family, and attempted to erase them from his memory by removing [their] photographs [from the residence]. Gloria prepared scripts[5] for Thomas to say to Mitchell or his daughters and caused him, for the first time, to express a desire to leave 75 percent of his estate to Gloria and 25 percent to charity.' (*Ibid*.) Gloria further wanted outright ownership of Thomas's residence. (*Tedesco I*, *supra*, E070316.)" (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 278.)

B.     *The Conservatorship.*

"As Thomas's memory took a 'huge nose dive' in 2013, he stopped paying bills and taxes, resulting in significant penalties. On September 9, 2013, Dr. Ivor J. Nazareth, a neurologist, evaluated Thomas and reported that he had 'significant cognitive impairment with a Mini Mental State Examination score of 23 out of 30.'[6] The doctor opined that Thomas 'is unable to make consistent and reliable rational decisions,

---

**5** "Thomas was directed to tell Mitchell the following: 'I have hired another law firm to represent me in regards to my conservatorship—I don't want your firm to represent me in this matter'; '[h]ave my wife own the house outright. [¶] It simplifies things. [¶] I want Gloria to own this house outright'; and '[d]isinherit my children.'" (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 29, fn. 6; see *White v. Davis*, *supra*, 87 Cal.App.5th at p. 278, fn. 6.)

**6** "The mini mental state examination is a 30-point test that uses a 'set of questions for screening cognitive function.'" (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 278, fn. 7.)

7

especially when it comes to his health or handling any financial issues, even simple ones. He needs total supervision.' (*Tedesco I*, *supra*, E070316.)  Concerned about Thomas's health and Gloria's actions, on May 2, 2014, White petitioned for the appointment of a conservator of Thomas's person, and . . . estate." (*White v. Davis*, *supra*, 87 Cal.App.5th at pp. 278-279.)

On June 10, 2014, the probate court investigator met with Thomas concerning the conservatorship.  The investigator advised Thomas of his rights, including the right to a jury trial.  On October 17, 2014, Kenneth Jenkins (Jenkins) was appointed as the guardian ad litem (GAL) for Thomas "with authority to investigate, retain, and discharge counsel for Thomas's protection." (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 279.) "Jenkins opposed the appointment of attorney Mary Gilstrap as Thomas's counsel on the grounds a conflict of interest existed since Gloria's attorney had recommended Gilstrap to Thomas." (*Ibid*.)  Instead, Jenkins engaged David Humphrey, Jr. (Humphrey) to represent Thomas.[7] (*Tedesco I*, *supra*, E070316.)

---

[7] At the same time, "Terence Nunan of Parker, Milliken, Clark, O'Hara & Samuelian (Parker Milliken) appeared in the action claiming to represent Thomas and seeking attorney fees for such representation.  The probate court found 'the attorney retainer agreement . . . executed by the then proposed conservatee [(Thomas) with attorney Nunan was] invalid' because Thomas lacked the capacity to engage counsel. The court expressed concern 'with regard to circumstances under which Nunan [had been] retained, particularly following [its] appointment of a [GAL] for the specific purpose of obtaining conflict-free counsel to represent the proposed conservatee.  The [GAL] performed as directed and attorney Humphrey was selected for representation.  It is unclear . . . what need or additional benefit was obtained by the retention (however questionable) of co-counsel.'" (*Tedesco I*, *supra*, E070316.)

"Undeterred by White's petition for a conservatorship of Thomas's estate, Gloria and Wear continued to influence Thomas to change his estate plan [by isolating him from his biological family]. Thus, on January 14, 2015, White applied for a restraining order against Wear on the [basis] that she was "'scheming to sabotage [Thomas's] relationship with his daughters, attempting to have [Thomas] amend his estate plan to favor Gloria, and trying to have [Thomas's] daughters removed as trustees of the relevant trusts.'" On January 15, 2015, White obtained a temporary restraining order (TRO) against Wear requiring her to refrain from discussing the issues of the conservatorship or Thomas's estate plan, or facilitating his access to any bank, accountant, attorney, or financial planner regarding the conservatorship or his estate plan. However, because Wear did not accept service of the TRO, service of process was not completed and, as a result, there was no hearing on the restraining order."[8] (*White v. Wear*, *supra*, 76 Cal.App.5th at pp. 29-30; see *White v. Davis*, *supra*, 87 Cal.App.5th at p. 279.)

"On March 3, 2015, Jenkins was relieved from his duties as Thomas's GAL. (*Tedesco I*, *supra*, E070316.) On June 15, 2015, after a contested court trial, the probate court concluded a temporary conservator of Thomas's estate was necessary because

---

[8] "White also sought a restraining order against Wendy, [and o]n February 11, 2015, Wendy stipulated that she would not discuss within the presence of Thomas the conservatorship of his estate, his estate plan, or his financial affairs, and she would not take or accompany him or be present with any banker, accountant, attorney, financial planner, or any person for any reason related to his conservatorship, his estate plan, or the financial management of his affairs." (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 30, fn. 7; see *White v. Davis*, *supra*, 87 Cal.App.5th at p. 279, fn. 8.)

Thomas was mentally deficient and "'very susceptible to being unduly influenced.'"'"[9]

(*White v. Davis*, *supra*, 87 Cal.App.5th at p. 279; see *White v. Wear*, *supra*, 76 Cal.App.5th at p. 30.) The court explained that Gloria had displayed "an inconsistent pattern" as to whether Thomas lacked capacity, seemingly based on her "litigation interests."[10] The court also found evidence of "undue influence," i.e., Gloria

---

[9] "The court opined that the case was 'unusual' because Thomas's 'needs are adequately met by existing estate planning documents prepared by the conservatee during the period of [his] full capacity.' The court noted that Thomas's lack of capacity was attested to by his treating physician, Richard G. Byrd, M.D., and neurologist Ivor J. Nazareth, M.D., and 'clearly shown and confirmed by the very recent, credible, and compelling report of Geriatric Psychiatrist, David W. Trader, appointed by the court as [an Evidence Code section] 730 expert by stipulation of all parties.' The court further noted that the appointment of a temporary conservator was warranted as 'there is evidence from which a reasonable inference may be made that undue influence (or at least attempts at such) of [Thomas] has occurred through persons yet to be determined.' More specifically, the court noted that 'about one year ago[, on September 9, 2014,] (about the time, or soon after, this matter was commenced and after the capacity reports of Dr. Byrd and Dr. Nazareth were prepared)' Thomas, accompanied by Gloria, attempted to withdraw $500,000 from [the Wells Fargo business] account . . . that was no longer under his control." (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 30, fn. 8; see *White v. Davis*, *supra*, 87 Cal.App.5th at p. 280, fn. 10.)

[10] "The court is concerned that the evidence and admissions within objector Gloria Tedesco's pleadings, reflect an inconsistent pattern as to whether she is accepting her obligations under the health care [power of attorney] to provide the assistance needed by the proposed conservatee. Her position has changed as to whether the proposed conservatee is competent to make his own decisions for health care. One may infer from the evidence, that the inconsistencies are attributable to objector's litigation interests rather than the best medical interests of the proposed conservatee."

accompanying Thomas to the bank to withdraw $500,000 from an account no longer held by him.[11]

On July 2, 2015, Thomas filed a demand for a jury trial on the petition for conservatorship. However, 29 days later, he filed a competing petition for appointment of David M. Wilson (Wilson) as temporary conservator of the estate. On August 10, 2015, the parties stipulated and agreed to the appointment of Wilson as permanent conservator of the estate, and the Hon. James A. Cox entered the formal order on August 13. (*Tedesco I*, *supra*, E070316.) The court later appointed independent counsel for Thomas. (*Ibid.*) No one appealed the conservatorship order.

During the same time, Wear was facilitating Thomas's communications with Russell Davis (Davis) (Wear worked as his paralegal) "who repeatedly requested to be appointed counsel for Thomas."[12] (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 30.) Each of Davis's applications was denied by the probate court for the reason "that the '"history

---

[11] "The appointment of a temporary conservator is further warranted as there is evidence from which a reasonable inference may be made that undue influence (or at least attempts at such) of the proposed conservatee has occurred through persons yet to be determined."

[12] In June 2016, Thomas requested that Davis be appointed as independent counsel, but the probate court appointed Jeremy J. Ofseyer on August 4, 2016. (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 30, fn. 9.) By September 22, 2016, Ofseyer moved to withdraw as court-appointed counsel because Gloria objected to his representation, claiming a conflict of interest based on his meeting with her many years prior. (*Ibid.*) A second request to have Davis appointed as Thomas's counsel was made; however, the court appointed Julia Burt on December 9, 2016. (*Ibid.*) Since Burt was thwarted from every effort to communicate with Thomas, and Gloria accused her of having a conflict of interest, Burt also moved to withdraw, and Kevin McKenzie was appointed on January 5, 2018. (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 280, fn. 10.) On October 9, 2020, the court granted McKenzie's motion to withdraw as Thomas's counsel.

11

of this case reflects a crucial need that independent counsel represent [Thomas], meaning that counsel be not related with or retained by family members who may have or might be involved in influencing the conservatee and retained counsel."'"' (*Ibid*.) The court further warned Davis that if he "'continues to contact a person under conservatorship, it may start fitting under the elder abuse statute, and there may be injunctive relief of another type, which, if violated, would then lead to a misdemeanor on behalf of an experienced member of the bar.'" (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 280.)

C.      *The Ongoing Litigation Challenging the Conservatorship.*

"Despite the existence of the conservatorship and the probate court's warning, in 2017, Gloria, Wear, and [Davis] pursued legal action with the end goal of allowing Thomas to gain control over his estate and all financial decisionmaking. They initiated civil actions that were not authorized by Wilson, sought the appointment of a GAL[13] to

---

[13] Stephen G. Carpenter (Carpenter) sought permission to act as Thomas's GAL. (*Tedesco I*, *supra*, E070316.) "Carpenter is a retired bank executive who 'has known the conservatee for about 13 years,' is a 'good friend,' and 'is concerned about the well-being of the conservatee.' However, according to Wilson, Carpenter 'came into [Thomas's] life after [meeting] his wife Gloria.' Shortly after Wilson was appointed conservator, 'Carpenter and [Gloria's] daughter, Debbie [Wear], had [Thomas] call [Wilson] and request an immediate meeting[; however,] it was really. . . Carpenter and Ms. [Wear] requesting the meeting, and they wanted information relating to the status of the case.'" (*Ibid*.)

act on behalf of Thomas, engaged the services of Herzog, Yuhas, Ehrlich & Ardell[14] and petitioned for termination of the conservatorship. (*Tedesco I*, *supra*, E070316.)" (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 280.) In March 2017, Gloria moved to disqualify Judge Cox on the grounds he made comments at a December 2016 hearing that "cause[d her] 'to doubt that [he] would be able to be impartial'"[15] and he provided advice to the parties in violation of Code of Civil Procedure section 170.1, subdivision (a)(2)(A).[16] On March 21, 2017, Judge Cox recused himself under Code of Civil

---

[14] The law firm of Ian Herzog (Herzog) and Evan D. Marshall (Marshall). "On June 2, 2017, Thomas signed an attorney-client agreement wherein he agreed that of the assets reclaimed, Herzog's firm would recover their costs first, then their legal fees at the following rates: 33½ percent of any recovery made before filing suit; 40 percent of any recovery made after filing suit; and 50 percent in the event of an appeal." (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 280, fn. 11.)

[15] ". . . I would like to encourage everybody in this case to put down their hatchets and give Mr. Tedesco some peace. Let him restore relationships with his children and his grandchildren. [¶] There have been hearings, recent hearings, indicating that there has been continued efforts to isolate him from his children and his grandchildren. That should stop. All this needs to stop. [¶] There is a matter—there are orders in place that protect him. And if this stops, these great expenses will be decreased dramatically, dramatically, including the cost of the conservator and his fees. . . . [¶] . . . [¶] This original case was started by the children with good cause. I've seen enough to know that they filed their papers in good faith. [¶] . . . [¶] The hatchets are continuing by Mrs. Tedesco. And I think she's mistaken . . . ."

[16] "And my only thought is that if this litigation is going to continue, in my opinion the way to bring it is for the interested person to bring a petition for substituted judgment, and then we'll just have to call the doctors back, have them review everything and go through it and determine whether he has testamentary capacity to change it. [¶] That would be, the way I think, of readdressing the issue of capacity to do an estate plan. [¶] Dr. Bassanelli's report doesn't seem to indicate anything that would change any indication or belief there's a reason to change the issue as to the conservatorship. [¶] But, anyway, I just wanted to give you that thought."

Procedure, section 170.1, subdivision (a)(6)(A)(iii), which provides for disqualification if for any reason, a "person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." The conservatorship was reassigned to the Hon. Thomas H. Cahraman.

Gloria, Wear, and Davis also interfered with Thomas's relationship with Burt, his appointed counsel, (see fn. 12, *ante*) causing her to move to withdraw. (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 31, fn. 10.) In support of Burt's motion, on or about July 5, 2017, Davis prepared and filed a declaration from Thomas that stated: "'I am very upset and angry that my life and liberty have been wrongfully taken from me. I worked hard all my life and have accumulated a sizeable estate. Now my daughters believe they are entitled to my estate, and they have curtailed my freedom and life in their misguided attempt to save estate taxes and to thwart my attempts to change my estate plan. My daughters have in effect imprisoned me and all I think about every day is getting rid of this conservatorship. It has robbed me of my happiness.' Burt and Wilson retained the Hon. Reva G. Goetz, Judge (Ret.), to observe a meeting on September 7, 2017, between Thomas, Burt, and Wilson. According to Judge Goetz, Thomas was accompanied by Gloria, several attorneys, and a 'body guard.' Despite his July 5, 2017, declaration, Thomas stated that he did not know that Burt had asked to be relieved as his court-appointed counsel, he did not know the names of his privately retained attorneys [(nonappointed counsel)], he did not remember signing an engagement letter with Herzog's firm, and his attorneys have not told him 'anything' about the case." (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 281.)

14

Carpenter, represented by nonappointed counsel, repeatedly sought permission to act as Thomas's GAL. (*Tedesco I*, *supra*, E070316.) The probate court denied the repeated requests and identified nonappointed counsel's disingenuous tactics at a June 2017 hearing, stating, "that [Davis] was using Carpenter in an 'effort to be the lawyer, in effect, for [Thomas].'" (*Ibid.*) Without regard for the probate court's decision, Carpenter (through nonappointed counsel) procured his appointment as Thomas's GAL in a separate civil action on October 17, 2017; no notice was provided to Wilson or the probate court. (*Ibid.*) "In response to the continued attempts to interfere with court-appointed counsel's relationship with Thomas, in 2018, Wilson petitioned the probate court for, inter alia, instructions/order affirming his power to initiate and maintain litigation on Thomas's behalf and barring any counsel not appointed by the probate court . . . from representing Thomas or initiating and pursuing litigation on his behalf." (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 281.) The petition was granted, "and on September 19, 2019, we affirmed the decision. (*Tedesco I*, *supra*, E070316.) In doing so, we noted that the 'driving force' behind the legal actions initiated outside the conservatorship 'appears to be Gloria, her daughters, and nonappointed counsel (who lacked independence because they were assisted by Gloria's daughter, [Wear], paralegal to [Davis]). Their motivation therefore is suspect.'" (*White v. Davis*, at p. 281.)

Despite our decision in *Tedesco I*, *supra*, E070316, Gloria, Wear, nonappointed counsel, and Carpenter have continued to interject themselves in Thomas's affairs under the assertions that (1) he never wanted a conservatorship, (2) White and her sisters breached their fiduciary duties and fraudulently transferred Thomas's wealth to

15

themselves, and (3) neither Wilson nor any court-appointed *independent* counsel are taking any actions to recover his misappropriated assets. (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 31; see *Tedesco I*, *supra*, E070316 & *Tedesco II*, *supra*, E069438.)

On September 28, 2018, nonappointed counsel and Carpenter, allegedly on Thomas's behalf, moved to disqualify Judge Cahraman on the grounds that he was "biased and/or prejudiced against the conservatee and/or his private attorneys . . . ." On October 11, 2018, Judge Cahraman filed an order striking the motion as untimely and failing to disclose any legal grounds for disqualification. However, six days later, he found his order to be untimely and, therefore, he was deemed disqualified by operation of law. The matter was reassigned to the Hon. John G. Evans.

Additionally, nonappointed counsel, Carpenter, and Wear initiated an Orange County action, which sought to remove Thomas's daughters as cotrustees of the living trust and to challenge the third amendment to that trust.[17] (*Tedesco II*, *supra*, E069438; *Tedesco III*, *supra*, G059883.) The Orange County probate court dismissed the petition, and nonappointed counsel appealed on behalf of Thomas, Carpenter, and Wear. (*Tedesco III*, *supra*, G059883.) On June 15, 2022, the Court of Appeal, Fourth Appellate District, Division Three, upheld the lower court's orders and rejected several of appellants' arguments, including the claim that the conservatorship and all subsequent

---

[17] The third amendment made the living trust irrevocable and not subject to alteration or amendment absent the unanimous vote of the trustor (Thomas) and the acting trustees (White, Kay & Bas). (*White v. Wear*, *supra*, 76 Cal.App.5th at pp. 28-29.)

16

orders in the conservatorship are void. (*Ibid*.) "[T]he California Supreme Court denied review on October 12, 2022." (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 285.)

Moreover, nonappointed counsel, Gloria, and Wear have continued to unduly influence Thomas to change his estate plan as evidenced by the creation of a purported amendment to the living trust (2020 amendment), which was signed on January 20, 2020, without notice to or approval of Wilson, the probate court, or the living trust's cotrustees.[18] (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 31.) "The purported amendment provides that Thomas is disinheriting his biological [family members] in favor of Gloria and her daughters, Wear and Wendy." (*Ibid*.) On March 12, 2020, Davis notified Thomas's daughters and their attorney "that Thomas had changed the designated beneficiaries of the Living Trust[, such that] 75 percent of the entire trust estate is to be distributed to Gloria upon Thomas's death, or to Gloria's daughters if Gloria does not

---

[18] The 2020 amendment, in part, provides: "'This 2020 Amendment to the Amended and Restated Thomas S. Tedesco Living Trust is made this 20th day of January, 2020, and executed by THOMAS S. TEDESCO as Trustor in order to make revisions to the Thomas S. Tedesco Living Trust.

'On March 27, 2019, I, Thomas S. Tedesco, executed a document to revoke my Trust in order to nullify the Third Amendment to my Trust which purportedly was executed by me but is not in accord with my wishes. I never agreed or approved of the Third Amendment and, if I did sign it, it was never explained to me by my attorney or my daughters. It was signed by me at the request of one of my daughters. The Third Amendment does not reflect my intent. Therefore, my intent was to revoke the trust in order to have my estate be distributed in accordance with my will as amended.

'I have been advised that I may not have the power to revoke my Trust. Therefore, in the event that such revocation is not allowed and, to the extent that I am able to do so, I hereby amend my Trust in order to be sure that my wishes concerning my estate after my death are honored.'" (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 31, fn. 12.)

survive Thomas[, and] that Carpenter and Cynthia Finerty would serve as cotrustees."

(*Id*. at p. 32.)

  D.  *The Petitions for Elder Abuse Restraining Orders.*

  On April 27, 2020, White, as cotrustee of the living trust, filed applications for Elder Abuse Restraining Orders (EAROs) against Carpenter, Gloria, Davis, Herzog, Marshall, and Wear (collectively referred to as defendants) based on their continued efforts to unduly influence Thomas to change his estate plan for their benefit. (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 31, fn. 11; *White v. Davis*, *supra*, 87 Cal.App.5th at p. 282.) White requested that each defendant be restrained from financially abusing Thomas, contacting him (either directly or indirectly), being within 100 yards of him, living or being in his home, and making any change, or facilitating any changes to his estate plan, including taking him to any attorney, accountant, financial planner, or banker, or by acting (or purporting to act) as his attorney or representative. (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 31; *White v. Davis, supra*, 87 Cal.App.5th at p. 282.)

Prior to the hearing on the merits of the EAROs, defendants (except for Wear)[19] successfully challenged Judge Evans under Code of Civil Procedure section 170.6, and the matter was reassigned to the Hon. Kenneth J. Fernandez. (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 282.) Defendants then filed separate anti-SLAPP motions on the grounds, inter alia, the applications for EAROs arise from protected activities involving the exercise of constitutionally protected rights of petition and freedom of speech, and improperly seek to interfere and adjudicate issues raised in the Orange County Superior Court case (*In re the Thomas S. Tedesco Living Trust*, No. 30-2019-01078628-PR TR CJC). (*White v. Davis*, at p. 283.) On March 22, 2021, the trial court denied each anti-SLAPP motion on the grounds that "'[n]othing here involves a protected activity,'" and White has "'made a *prima facie* factual showing sufficient to sustain a favorable judgment as to all six [defendants].'" (*Id.* at p. 284.) Defendants appealed and we affirmed. (*Id.* at p. 294.)

---

**19** Wear "did not file any response or paperwork, nor did she appear at the hearing. Rather, on July 29, 2020, the Herzog firm (Marshall) filed a document denominated as 'NOTICE OF NON-SERVICE,' which alleged that Wear had 'not been served with process' and, in the event she is served, she would file a special motion to strike under Code of Civil Procedure section 425.16." (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 32.) Thus, on July 30, 2020, the trial court (Judge Evans) granted the EARO against Wear. "Wear was ordered to not abuse (financially or otherwise) or contact (directly or indirectly) Thomas; to not make, or facilitate, any change to Thomas's estate plan; to stay at least 100 yards away from [Thomas]; to move out and not return to [Thomas's] home in Indian Wells . . . ; and to not own, possess, have, buy or try to buy, receive or try to receive, or in any other way get guns, other firearms, or ammunition." (*Id.* at pp. 33-34.) We affirmed the order except for the prohibition "from owning, possessing, having, buying or trying to buy, receiving or trying to receive, or in any other way getting guns, other firearms, or ammunition." (*Id.* at p. 42.)

On March 23, 2021, Carpenter and Gloria filed a first amended verified petition to vacate all the orders in this conservatorship, including the establishment of the conservatorship and appointment of Wilson as the conservator. Nonappointed counsel (Marshall) verified the petition. According to petitioners, the order conserving Thomas is void because he was not given the rights and advisements required by Probate Code sections 1822, 1827, and 1828, he did not waive his right to a jury trial, he did not authorize the stipulation for the order conserving him pursuant to Code of Civil Procedure section 664.6, and Judge Cox was disqualified after entering the order conserving Thomas. The petition alleges a pattern of fraud, deceit and elder abuse committed by Thomas's daughters, their lawyers, Wilson, and Wilson's lawyers, to prevent Thomas from having independent counsel, adjudicating the validity of the conservatorship, or securing a hearing on the merits of his civil claims.

The cotrustees of the trust demurred on the grounds the petition failed to state a cause of action, "preclusion under law of the case," and Gloria and Carpenter lack standing. Wilson moved to strike the verified petition and to disqualify nonappointed counsel from representing any party in this matter or any substantially related proceeding. On June 17, 2021, following a hearing, the probate court struck the petition on the grounds it was time-barred, the parties lacked standing, and each basis in support of the petition had been litigated, determined against petitioners' favor, affirmed on appeal, and are now law of the case. Moreover, the court stated that nonappointed counsel may not represent Thomas "directly or indirectly, and specifically by representing . . . Carpenter

and/or Gloria . . ." The court further sustained the demurrer to the petition, without leave to amend.

On August 17, 2021, nonappointed counsel, on behalf of themselves, Thomas, Carpenter, and Gloria appealed the orders of the probate court. Subsequently, this court dismissed the appeal under California Rules of Court, rule 8.140, for failure to timely deposit costs for preparing the record. Appellants' motion to vacate the dismissal was denied as to Thomas, Carpenter, and nonappointed counsel, but granted as to Gloria's "appeal of the order entered June 17, 2021, denying the First Amended Petition to Vacate Order Establishing Conservatorship etc., without prejudice to the parties' further discussion in their briefs of whether this court's holding in case No. E070316 pertains to Gloria."

## II. DISCUSSION

### A. *Standard of Review.*

"A motion to strike a pleading under Code of Civil Procedure section 436 is reviewed for abuse of discretion." (*Pacific Gas and Electric Co. v. Superior Court* (2006) 144 Cal.App.4th 19, 23.) A trial court's decision denying or granting a motion to vacate an order is reviewed for abuse of discretion. (See *Austin v. Los Angeles Unified School Dist.* (2016) 244 Cal.App.4th 918, 929; see *Hudson v. Foster* (2021) 68 Cal.App.5th 640, 661 [under limited circumstances, a probate court order denying a motion to vacate on equitable grounds is appealable; reviewed for abuse of discretion].) The appellate court shall reverse the actions of the lower court only where no reasonable basis for the action is shown and where in its exercise, the court exceeds the bounds of

21

reason under the circumstances. (*Conservatorship of Farrant* (2021) 67 Cal.App.5th 370, 376 ["'"'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion . . . .'"'"].)

### B. Analysis.

In challenging the probate court's order denying her petition to vacate all the orders in this conservatorship, Gloria contends the following: (1) the denial of a hearing on the validity of the conservatorship—coupled with the failure to afford independent representation for Thomas—is per se error, voiding all orders and appellate opinions, and requiring the dismissal of the conservatorship; (2) the conservatorship is void *ab initio* because there is no valid stipulation, Judge Cox was disqualified, and Thomas never waived his right to a jury trial nor received the required advisements; (3) denial of independent counsel "is a fundamental, statutory and structural error";[20] (4) Gloria has a personal interest in seeking, and a statutory right to seek, vacatur of the conservatorship and assertion of Thomas's claims for violation of his civil rights; (5) Thomas's current competence is immaterial to the validity of the conservatorship; (6) nonappointed

---

[20] Gloria also asserted that respondents failed to address the "other bases for invalidating the conservatorship," including the right to seek removal of Wilson, the use of the conservatorship to prevent Thomas from exercising his trust rights, and the violation of the statutory rights of Gloria and Carpenter. However, for these assertions, she offers no authority and analysis. Because she fails to support her arguments with citations to supporting authority, the arguments are forfeited. (*Estate of Cairns* (2010) 188 Cal.App.4th 937, 949 [failure to provide argument or authority forfeits contention].) We will not act as counsel for a party to construct a proper and persuasive argument. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 [appellate court not required to construct legal arguments for party].)

counsel's representation is necessary and required; (7) disqualification of nonappointed counsel was aimed at preventing the adjudication of Thomas's rights; and (8) the probate court may not disqualify nonappointed counsel in other proceedings.

       1.     *The February 2018 challenge to the conservatorship was previously decided.*

Gloria claims the denial of a hearing on the February 2018 motion challenging the validity of the conservatorship—coupled with the failure to afford independent representation for Thomas—is per se error, voiding all orders and appellate opinions, and requiring the dismissal of the conservatorship. We disagree.

The issue regarding the failure to hold a hearing on the validity of the conservatorship was the subject of a petition for writ of mandate in *Tedesco v. Superior Court* (*Laura White et al.*) (Sept. 12, 2019, E073517). We denied Thomas's petition to direct the probate court to rule on his February 2018 motion to vacate the conservatorship. Our denial was supported by our decision in *Tedesco I*, *supra*, E070316, which affirmed the probate court's order (1) terminating nonappointed counsel from representing Thomas and (2) confirming the power and authority to initiate and maintain litigation on Thomas's behalf resides with the conservator and/or independent court-appointed counsel only. Since our opinion voided all actions initiated by

23

nonappointed counsel, it consequently resolved the viability of the February 2018 motion.[21] (See *Tedesco I*, *supra*, E070316.)

Because the issue was previously raised, and decided, in our prior opinion and our prior order denying the petition for writ of mandate, it is final and constitutes res judicata. (*Lazzarone v. Bank of America* (1986) 181 Cal.App.3d 581, 591 [doctrine of res judicata is applicable in probate proceedings].) As we previously stated in *Tedesco I*, *supra*, E070316: "As an incapacitated person, Thomas lacks the legal ability to retain or direct counsel. (Civ. Code, §§ 40, 2356, subd. (a)(3) [an agency terminates upon the 'incapacity of the principal to contract']; Prob. Code, § 1872, subd. (a); *Conservatorship of Chilton* [(1970)] 8 Cal.App.3d [34,] 40-41; *Sullivan v. Dunne* [(1926)] 198 Cal. [183,] 193-194.) However, upon his request, the probate court must appoint independent counsel." The probate court did just that when it appointed Ofseyer on August 4, 2016, Burt on December 9, 2016, and McKenzie on January 5, 2018. (See *ante*, fn. 12.)

Nonetheless, the evidence insinuates that Gloria did not favor any court-appointed independent counsel that could not be controlled. With Wear's assistance, Gloria manipulated Thomas's opinion of his counsel as demonstrated by his rejection of each independently appointed attorney followed by his demand for the appointment of Davis

---

[21] Gloria claims the unreasonable delay in hearing the motion to vacate the conservatorship constituted a due process violation which requires dismissal of the conservatorship. This contention is not supported by citations to the record or supporting authority—other than case law involving delays in criminal proceedings—and is accordingly forfeited. (See *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 629-630 [failure to support assertion with citation to authority forfeits claim].)

24

and nonappointed counsel. (*Tedesco I*, *supra*, E070316.) Specifically, when the probate court refused to appoint Davis, Gloria and Wear influenced Thomas to retain nonappointed counsel without court approval. (*Ibid.*) Accordingly, if Thomas has been denied independent representation, then the evidence suggests that the denial is because Gloria has rejected each independent court-appointed counsel in favor of counsel of her or Wear's choosing. (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 30 ["[T]he '"history of this case reflects a crucial need that independent counsel represent [Thomas], meaning that counsel be not related with or retained by family members who may have or might be involved in influencing the conservatee and retained counsel."'"].)

### 2. *The conservatorship is not void ab initio.*

Gloria contends the conservatorship is void *ab initio* because there is no valid stipulation to the appointment of a conservator, Judge Cox was disqualified, and Thomas's statutory rights were violated. Since the record fails to support her contention, we reject it.

#### a. Thomas stipulated to Wilson's appointment.

Gloria claims the order appointing Wilson, based on the parties' *oral* stipulation, is void. Not so. The facts demonstrate that all parties were represented by counsel, placed their stipulation on the record before the probate court, and Thomas's counsel prepared the order based on the stipulation.

Following a court trial on White's petition for the appointment of a conservator of Thomas and his estate, on June 15, 2015, the probate court appointed Jenkins as the temporary conservator of Thomas's estate only. (*Tedesco I*, *supra*, E070316.) Although

25

Thomas was represented by attorney Humphrey (whose services were engaged by Jenkins), Thomas retained Nunan of Parker Milliken, who worked with Humphrey in response to White's petition for conservatorship. (*Ibid.*) On July 2, 2015, Nunan filed a demand for a jury trial on White's petition; trial was set for September 21, 2015. However, 29 days later, Nunan (on behalf of Thomas) and cocounsel Humphrey filed a competing petition for appointment of Wilson as conservator of his (Thomas's) estate. According to the competing petition, Thomas consulted his counsel and agreed to be "subjected to a Conservatorship of the Estate with an independent professional fiduciary in whom he has confidence that such fiduciary will act in his best interests." Thomas, "[b]y his signature," nominated Wilson to "end the current contested proceeding." Nunan and Humphrey referred Wilson to Thomas.

Subsequently, on August 10, 2015, Thomas and his attorneys, Humphrey and Nunan, informed the probate court that no party—including Gloria, the cotrustees, Thomas's grandchildren—objected to Thomas's petition to appoint Wilson as conservator. Because trial on Thomas's petition was set for October 23, Gloria's counsel sought to expedite the hearing. In response, all counsel indicated they had the authority to stipulate to the appointment of the general conservator "today." Thus, all parties stipulated on the record, and Thomas agreed, to the appointment of Wilson as conservator of Thomas's estate. Humphrey offered to prepare, and Nunan and Humphrey prepared, the order confirming the stipulation to appoint Wilson; the order was filed on August 13, 2015. Contrary to Gloria's claim, there was more than simply an "oral stipulation" to the appointment of Wilson.

26

b. Judge Cox's disqualification in 2017 did not void the order appointing Wilson.

Gloria contends that Judge Cox's disqualification in 2017 is evidence that his acts in 2015 infected his rulings and Thomas's consent or agreement since he was under the perception the judge was not biased. We disagree.

Gloria moved to recuse Judge Cox on the grounds (1) he repeatedly accused her "of undue influence, and of causing [Thomas] to be estranged from his family," (2) Judge Cox lived in an "adjoined townhouse next to very close friends of" White causing Gloria to doubt his impartiality and to believe he "may have outside knowledge of the case," (3) he offered "unsolicited advice," and (4) she believed he "has a terrible opinion of [her], and is biased against [her]." To avoid the appearance of bias, Judge Cox recused himself. (Code, Civ. Proc, § 170.1, subd. (a)(6)(A)(iii) [A judge shall be disqualified if "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."].)

According to Code of Civil Procedure section 170.3, subdivision (b)(4): "If grounds for disqualification are first learned of or arise after the judge has made one or more rulings in a proceeding, but before the judge has completed judicial action in a proceeding, the judge shall, unless the disqualification be waived, disqualify himself or herself, but in the absence of good cause the rulings he or she has made up to that time shall not be set aside by the judge who replaces the disqualified judge." Case law is split on whether a disqualified judge's prior rulings are void or voidable. (Compare *Hayward v. Superior Court* (2016) 2 Cal.App.5th 10, 17 ["the rulings and orders issued by the

temporary judge are all void and must be vacated"]; *Christie v. City of El Centro* (2006) 135 Cal.App.4th 767, 780 [in dicta, the court concluded "whether void or voidable, the order must be vacated"]; with *Urias v. Harris Farms*, *Inc*. (1991) 234 Cal.App.3d 415, 424 (*Urias*) [as a general rule, the actions of a disqualified judge are voidable, provided that the disqualification issue had been properly raised by an interested party]; *Betz v. Pankow* (1993) 16 Cal.App.4th 931, 940 (*Betz*) ["[T]he acts of a judge subject to disqualification for cause are voidable rather than void."].

Having considered the split in authority, we stand by the jurisdictional approach adopted in *Urias* and *Betz* and conclude the orders issued prior to disqualification are voidable rather than void. (*Betz*, *supra*, 16 Cal.App.4th at p. 940 ["We concur with Witkin and those cases concluding that the acts of a judge subject to disqualification for cause are voidable rather than void . . . ."].) We apply this interpretation of California law to the facts of this case. Gloria's motion to disqualify was based, primarily, on her belief that Judge Cox was biased against her—not Thomas[22]—and possessed outside

_____

[22] When Gloria challenged Judge Cox, she cited to his various comments from the December 2016 hearing: ". . . there appears like there are probably conflicting interests between Mr. Tedesco and his wife, **most of which appear to be created by your client** [referring to Gloria Tedesco]." (The boldface was added in Gloria's motion challenging Judge Cox.) Judge Cox continued: "But after reading Dr. Bassanelli's report, now I understand the real reason all this is happening, and it's, again, going back to what started this whole thing in the first place was Mrs. Tedesco's desire with her husband falling into dementia problems to affect a change in the estate plan. [¶] It becomes clear to me after I see Dr. Bassanelli's report. It fully discloses something that I didn't think was the case." Later in the hearing, the judge added: ". . . I would like to encourage everybody in this case to put down their hatchets and give Mr. Tedesco some peace. Let him restore relationships with his children and his grandchildren. [¶] There have been hearings, recent hearings, indicating that there has been continued efforts to

*[footnote continued on next page]*

28

knowledge about the case. However, her "belief" rested on speculation. Except for her

declaration, nothing in the record supports her claims of bias or ex parte communications.

Gloria's reliance on *Giometti v. Etienne* (1934) 219 Cal. 687, 688-689 [justice was

disqualified because he was related to petitioner's counsel], and *Christie v. City of El

Centro* (2006) 135 Cal.App.4th 767, 776-780 [judge was disqualified because he

communicated with prior disqualified judge immediately prior to ruling on the motion]

does not assist her. In both cases, the grounds for disqualification were readily apparent

from the record; here, they are not.

Moreover, while parties are entitled to an impartial judge, "opinions formed by the

judge on the basis of facts introduced or events occurring in the course of the current

proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality

motion unless they display a deep-seated favoritism or antagonism that would make fair

judgment impossible. Thus, judicial remarks during the course of a trial that are critical

or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not

support a bias or partiality challenge." (*Liteky v. U.S.* (1994) 510 U.S. 540, 555.)

---

isolate him from his children and his grandchildren. That should stop. All this needs to
stop. [¶] There is a matter—there are orders in place that protect him. And if this stops,
these great expenses will be decreased dramatically, dramatically, including the cost of
the conservator and his fees. . . . [¶] . . . [¶] **This original case was started by the
children with good cause. I've seen enough to know that they filed their papers in
good faith.** [¶] . . . [¶] **The hatchets are continuing by Mrs. Tedesco.** And I think
she's mistaken— [¶] . . . [¶] —in her understanding and the things that she's telling her
husband." (Again, the boldface was added in Gloria's motion challenging Judge Cox.)

Judge Cox's statement was not made in isolation. Rather, it was based on
evidence that had been presented to the court. Even if this statement suggests a bias
against Gloria, it does not support a bias against Thomas, the conservatee.

29

"Neither strained relations between a judge and an attorney for a party nor '[e]xpressions of opinion uttered by a judge, in what he [or she] conceived to be a discharge of his [or her] official duties, are . . . evidence of bias or prejudice.'" (*Roitz v. Coldwell Banker Residential Brokerage Co.* (1998) 62 Cal.App.4th 716, 724.)

In short, Gloria has not established good cause for voiding Judge Cox's prior orders.

c.     The alleged violation of statutory rights.

Gloria contends Thomas's statutory rights were violated because he never waived his right to a jury trial nor received the necessary disclosures under Probate Code sections 1827 and 1828. Assuming, without deciding, the probate court failed to comply with the statutory procedures, the conservatorship order is not void, but voidable because the court had fundamental jurisdiction over the parties and the subject matter. "We have described courts that violate procedural requirements . . . as acting '"in excess of jurisdiction."' [Citation.] Because a court that acts in excess of jurisdiction still has 'jurisdiction over the subject matter and the parties in the fundamental sense' [citation], any such act is 'valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time' [citation]. In contrast to errors concerning a court's fundamental jurisdiction, '[e]rrors which are merely in excess of jurisdiction should be challenged directly . . . and are generally not subject to collateral attack once the judgment is final . . . .'" (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 339-340.) The time to challenge the conservatorship order, a voidable order, has long since passed. (*Lee v. An* (2008) 168 Cal.App.4th 558, 564 ["'Errors

30

which are merely in excess of jurisdiction should be challenged directly, . . .' and generally are not subject to collateral attack once the judgment is final in the absence of unusual circumstances which prevented an earlier, more appropriate attack."].)

Moreover, Gloria is estopped from challenging the conservatorship order given her prior acquiescence in its creation. Neither she nor Thomas—including Humphrey and Nunan (Thomas's privately retained counsel)—objected to the procedures used by the probate court. Rather, they fully participated in the proceedings. Given their acquiescence in the stipulation for the appointment of Wilson, the circumstances warrant the application of principles of estoppel and res judicata to preclude Gloria from challenging the probate court's action. (*Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1087-1088, 1090, 1092 [a party's conduct that manifests consent to the probate court's procedure in appointing conservator estops the party from challenging the validity of the appointment].)

### 3. Thomas was not denied independent counsel.

Gloria asserts that Thomas was denied his fundamental, statutory right to independent counsel. Not so.

As a conservatee, Thomas's right to independent counsel is not absolute. Rather, counsel must be approved by the probate court. (Prob. Code, § 1872, subd. (a) ["Except as otherwise provided in this article, the appointment of a conservator of the estate is an adjudication that the conservatee lacks the legal capacity to enter into or make any transaction that binds or obligates the conservatorship estate."]; *Conservatorship of Chilton* (1970) 8 Cal.App.3d 34, 40 [affirming the trial court's denial of an award of

31

attorney fees where a conservatee signed a retainer agreement when she had no capacity to enter into a valid contract employing petitioner as her attorney].) Thomas was provided independent counsel when the court appointed Ofseyer, then Burt; however, both sought to be relieved as Thomas's counsel based on Gloria's or nonappointed counsel's interference in the conservatorship and their attorney-client relationship with Thomas. (*Tedesco I*, *supra*, E070316.) In 2018, the court appointed McKenzie as Thomas's independent counsel, but McKenzie lost his independence when he allowed nonappointed counsel—introduced to Thomas via Gloria or Wear—to dictate what he (McKenzie) would advocate on Thomas's behalf. Thus, McKenzie has also been relieved as Thomas's counsel.

As the probate court and this court have repeatedly stated, nonappointed counsel have no authority to represent Thomas, and Thomas has no power to retain nonappointed counsel, absent court approval. (*Tedesco I*, *supra*, E070316.) If anyone has denied Thomas his right to independent counsel it is Gloria, Wear, and/or nonappointed counsel, who challenge any court-appointed attorney failing to agree with their agenda.

4. *Gloria's standing in the conservatorship.*

Gloria contends she has standing to seek vacatur of the conservatorship and assert Thomas's claims for violation of his civil rights because (1) no prior order or appellate opinion established her lack of standing, (2) Probate Code sections 1820, subdivision (a), 2622, 2651, and 2593 provide her statutory standing, (3) her personal interest as a beneficiary under the trust provides standing, (4) attempts to disqualify her provide standing, and (5) she possesses "next friend" standing. We agree that Gloria has standing

32

to petition for termination of the conservatorship; however, she has no standing to assert Thomas's claims for violation of his civil rights.

Gloria cites several statutes that provide standing for the spouse of a conservatee to raise challenges in and to the conservatorship. Probate Code section 2622 provides that a conservatee's spouse "may file written objections to the account of the . . . conservator, stating the items of the account to which objection is made and the basis for the objection." Probate Code section 2651 allows a conservatee's spouse to petition the court to have the conservator removed if the stated facts show cause for removal. Probate Code section 2593, subdivision (a), provides: "The court, . . . on petition of any interested person, when it appears to be for the best interests of the . . . conservatee or the estate, may withdraw any or all of the powers previously granted pursuant to this article or may impose restrictions, conditions, and limitations on the exercise of such powers by the . . . conservator." An "'interested person'" includes a spouse. (Prob. Code, § 48, subd. (a)(1).) Moreover, a conservatee's spouse may petition to terminate the conservatorship, but the petition must state facts showing the conservatorship is no longer required. (Prob. Code, § 1861, subds. (a)(3), (b) ["(a) A petition for the termination of the conservatorship may be filed by . . . [¶] . . . [¶] (3) The spouse . . . of the conservatee . . . . [¶] (b) The petition shall state facts showing that the conservatorship is no longer required."].) Thus, we agree that Gloria, as Thomas's spouse, has standing to petition for termination of the conservatorship.

Regarding her standing to raise Thomas's claims for violation of his civil rights, Gloria argues she has "next friend" standing to challenge the probate court's

33

"unconstitutional disenfranchisement." We reject her argument because her premise is flawed. Contrary to Gloria's assertion, neither Wilson nor the court has deprived Thomas of independent counsel. Rather, the evidence shows that the court's attempts to appoint independent counsel for Thomas have been repeatedly thwarted by Gloria, Wear, or others who injected themselves into the attorney-client relationship, and made it impossible for appointed counsel to remain independent and act solely for Thomas's benefit. After forcing independent court-appointed counsel to withdraw, Gloria, with the help of Wear and others, then presented her handpicked attorneys (nonappointed counsel) to the probate court for appointment. Recognizing that these attorneys may be compromised, the court refused to appoint them as independent counsel for the reason "that the '"history of this case reflects a crucial need that independent counsel represent [Thomas], meaning that counsel be not related with or retained by family members who may have or might be involved in influencing the conservatee and retained counsel."'" (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 30.)

5. *The materiality of Thomas's current competence.*

Gloria contends Thomas's current competence is immaterial to the validity of the conservatorship. While Gloria cites *Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378, 384, for the proposition that "the critical issue here is [the conservatee's] fundamental right to decide who hears the evidence to make that finding—a judge or a jury," she fails to offer any argument or analysis in support of her claim. We, therefore, deem the issue forfeited. (See *Estate of Cairns*, *supra*, 188 Cal.App.4th at p. 949.) Even if we were to reach the merits, her claim fails because it rests on the false

34

premise that the conservatorship was void *ab initio*. (See discussion II.B.2, *ante*.)

Moreover, Thomas's current competence is relevant to a petition to terminate the

conservatorship. (Prob. Code, §§ 1861 [petition for termination of conservatorship],

1863, subd. (b)(1)(B) [conservatee must be produced at the hearing unless unable to

attend "by reason of medical inability"], 1863, subd. (c) [the probate court assesses the

conservatee's capacity and determines whether clear and convincing evidence supports

the continuation of the conservatorship].)

6. *Nonappointed counsel are disqualified from representing Thomas and Gloria.*

Gloria argues that nonappointed counsel are entitled to represent Thomas's

interests because (1) they are acting on his wishes, (2) Thomas and Gloria have a right to

counsel of their choosing, (3) McKenzie, court-appointed counsel, endorsed every action

taken by nonappointed counsel, (4) Thomas and Gloria shared a common desire to end

the conservatorship, remove his daughters, and restore his control over his estate,

(5) nonappointed counsel may not be barred from representing Gloria or Carpenter

because they also represent Thomas, (6) Thomas has a right to be represented in a motion

to disqualify nonappointed counsel, (7) this court lacks jurisdiction over nonappointed

counsel, and (8) Wilson has no standing to disqualify nonappointed counsel. As we

explain, we disagree.

As to Thomas, nonappointed counsel may not represent him unless approved and

appointed by the probate court. This issue has been previously raised, and decided, in

one of our prior opinions and an order denying the petition for writ of mandate, it is final

and constitutes res judicata. (*Lazzarone v. Bank of America*, *supra*, 181 Cal.App.3d at p. 591.) Nonetheless, we reiterate, as an incapacitated person, Thomas lacks the legal ability to retain or direct counsel; however, upon his request, the probate court must appoint independent counsel. (*Tedesco I*, *supra*, E070316) Neither Wilson (as conservator), nor Thomas's family members (including Gloria), have the power to replace a conservatee's independent, court-appointed counsel with counsel they select because to do so would "render [Thomas's] right to independent counsel meaningless." (*Michelle K. v. Superior Court* (2013) 221 Cal.App.4th 409, 447 [the rationale and need for independent, court-appointed counsel exists when a conservator or other representative proposes acts that would significantly affect a conservatee's fundamental rights].)

As to Gloria, under normal circumstances, the probate court may not restrict her choice of counsel to represent her personal interests. However, this case does not involve normal circumstances because nonappointed counsel were first retained by Thomas. (*White v. Davis*, *supra*, 87 Cal.App.5th at p. 281; see Evid. Code, § 951 [attorney-client relationship created upon initial consultation].) When nonappointed counsel requested court approval of their retainer agreement or authorization to act as court-appointed, independent counsel, the probate court rejected their request because they were introduced to Thomas through Gloria or Wear and, thus, were not independent. The purported retainer agreement was secured from Thomas through the imposition of undue

36

influence.[23]  Despite the court's rejection of their request, nonappointed counsel have repeatedly stated they represent Thomas and filed pleadings on his behalf. Simultaneously, nonappointed counsel have represented Wear, Gloria, and Carpenter. (*White v. Davis*, *supra*, 87 Cal.App.5th at pp. 274-275; *White v. Wear*, *supra*, 76 Cal.App.5th at p. 27.)  Given the adverse interests of Thomas (on the one hand) and Gloria, Wear, and Carpenter (on the other), nonappointed counsel are disqualified from representing Gloria based on a conflict of interest.  "'Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are *threatened by* his [or her] responsibilities . . .' to the attorney's other interests." (*Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, 1140; see *People ex rel. Dept of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1147 ["[T]he most egregious conflict of interest is representation of clients whose interests are directly adverse in the same litigation."]; see also Cal. Rules of Professional Conduct, rules 1.7 and 1.9 [addressing conflicts of interest involving current and former clients].)

---

[23]  Although Gloria asserts that Thomas is "100% aligned" with her, given his incapacity, he was and is susceptible to undue influence by Gloria, Wear, and Carpenter whose self-interests (to become primary beneficiaries of Thomas's estate) conflict with Thomas's pre-incapacity interests (as expressed in his decades' old estate plan).  Also, as noted by Wilson, Gloria's interests are directly opposing to Thomas's interests based on her petition to vacate the conservatorship order, which was specifically requested by him and designed to protect him from undue influencers.  Also, evidence introduced in the conservatorship shows that Gloria has repeatedly sought to disrupt Thomas's relationship with his biological family to achieve her own personal financial interests and objectives. (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 29; *Tedesco I*, *supra*, E070316.)

Given the existing conflict of interest, nonappointed counsel are disqualified from representing Gloria without Thomas's informed written consent.[24] However, as a conservatee, Thomas does not have the legal capacity to provide that informed consent. (See Civ. Code, § 40; Prob. Code, §§ 1870, 1872, subd. (a).) Thus, the probate court correctly ruled that nonappointed counsel may not represent Gloria.

      *7.     Disqualification of nonappointed counsel was not aimed at preventing adjudication of Thomas's rights.*

Gloria claims the disqualification of nonappointed counsel was aimed at preventing the adjudication of Thomas's rights. Not so. This case involves a wealthy conservatee, whose second wife has used the conservatee's diminished capacity to change his decades-old estate plan to favor herself and her family over his biological family. (See *White v. Wear*, *supra*, 76 Cal.App.5th at p. 29; *White v. Davis*, *supra*, 87 Cal.App.5th at p. 275; *Tedesco I*, *supra*, E070316.) If anyone has interfered with the adjudication of Thomas's rights, it has been Gloria (and Wear). When the probate court appointed independent counsel, Gloria, Wear, or others injected themselves into the attorney-client relationship, making it impossible for appointed counsel to remain independent and act solely for Thomas's benefit. It is worth repeating that because nonappointed counsel were selected by Gloria, with the help of Wear and others, the probate court refused to appoint them as independent counsel for the reason

---

[24] Gloria is aware of the concept of disqualification based on a conflict of interest as she notes that Thomas's prior attorney (Mitchell) could not continue to represent Thomas, post conservatorship, since he represented Thomas's daughters.

"that the '"history of this case reflects a crucial need that independent counsel . . . not [be] related [to] or retained by family members who may have or might be involved in influencing the conservatee and retained counsel."'" (*White v. Wear*, *supra*, 76 Cal.App.5th at p. 30.) Thus, disqualification of nonappointed counsel was based on their lack of independence (as to Thomas) and their conflict of interests (as to Gloria).

        8.    *The probate court may disqualify nonappointed counsel in other proceedings.*

Gloria asserts the probate court may not disqualify nonappointed counsel in other proceedings. We disagree. The probate court has exclusive concurrent jurisdiction over any issue that affects the conservatorship and Thomas, as the conservatee. Under the doctrine of exclusive concurrent jurisdiction, "when two or more courts have subject matter jurisdiction over a dispute, the court that first asserts jurisdiction assumes it to the exclusion of the others. [Citation.] The rule is based upon the public policies of avoiding conflicts that might arise between courts if they were free to make contradictory decisions . . . relating to the same controversy and preventing vexatious litigation and multiplicity of suits." (*Shaw v. Superior Court* (2022) 78 Cal.App.5th 245, 255.) Thus, to the extent nonappointed counsel's representation of Thomas or Gloria in other matters impacts the conservatorship, nonappointed counsel may be disqualified from such representation by the probate court.

## III.  DISPOSITION

The order is affirmed.  Respondents are awarded their costs on appeal.

CERTIFIED FOR PUBLICATION


McKINSTER _____
J.

We concur:


RAMIREZ _____
P. J.


SLOUGH _____
J.

40